On Remand from the Alabama Supreme Court

BASCHAB, Presiding Judge.
In accordance with the Alabama Supreme Court’s opinion in Smith v. State, 213 So.3d 239 (Ala.2007), we remand this case to the trial court with instructions that that court conduct proceedings that are consistent with that opinion. On remand, the trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 56 days after the release of this opinion. The return to remand shall include the trial court’s written findings of fact and a transcript of the Atkins hearing.
REMANDED WITH INSTRUCTIONS.
McMillan, shaw, wise, and WELCH, JJ., concur.

On Return to Fourth Remand

PER CURIAM.
In 1998, Jerry Jerome Smith, was convicted of murdering Willie Flournoy, Theresa Helms, and David Bennett by one act or pursuant to one scheme or course of conduct, an offense defined as a capital offense by § 13A-5-40(a)(10), Ala.Code 1975. The jury recommended, by a vote of 11 to 1, that Smith be sentenced to death. The circuit court sentenced Smith to death.
*265 On appeal, this Court affirmed Smith’s capital-murder conviction, but remanded the case for the circuit court to correct its sentencing order. See Smith v. State, 213 So.3d 108 (Ala.Crim.App.2000). After remanding the case a second time for the circuit court to correct its sentencing order, this Court affirmed Smith’s death sentence, See Smith v. State, 213 So.3d 108, 209 (Ala.Crim.App.2000) (opinion on return to second remand). However, on certiora-ri review the Alabama Supreme Court reversed Smith’s death sentence and ordered a new penalty-phase hearing. See Ex parte Smith, 213 So.3d 214 (Ala.2003).
A new penalty-phase hearing was held, and the jury recommended, by a vote of 10 to 2, that Smith be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Smith to death.
On return from the second penalty-phase hearing, Smith argued that he is mentally retarded and that according to the United States Supreme Court’s opinion in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), he could not be sentenced to death. This Court held that Smith was mentally retarded and that he was ineligible for the death penalty, and we directed the circuit court to set aside Smith’s death sentence and sentence Smith to life imprisonment without the possibility of parole. See Smith v. State, 213 So.3d 226, 228 (Ala.Crim.App.2006) (opinion on return to third remand).
On certiorari review the Alabama Supreme Court reversed this Court’s decision and directed this Court to remand the case to the circuit court for that court to hold an Atkins v. Virginia hearing to determine whether Smith is mentally retarded and for that court to make specific findings of fact pursuant to the factors set out by the Alabama Supreme Court in Ex parte Perkins, 851 So.2d 453 (Ala.2002). See Smith v. State, 213 So.3d 239 (Ala.2007). In compliance with the Supreme Court’s instructions, we remanded the case to the circuit court. See Smith v. State, 213 So.3d 255 (Ala.Crim.App.2007).
On remand, the circuit court complied with the Supreme Court’s instructions, conducted an Atkins hearing, and set out its findings of fact. This case is now before this Court on return to fourth remand.

Mental Retardation

A statement of the facts surrounding the murders is helpful in evaluating the issues presented in this case. This Court stated the following facts in our 2000 opinion affirming Smith’s capital-murder conviction:
“The prosecution’s evidence showed that [Smith], a drug dealer, went to the residence of Willie Flournoy in Dothan, around 8:30 p.m., on October 19, 1996, to collect $1,500 Flournoy owed him for crack cocaine Flournoy had purchased. Flournoy told [Smith] that he did not have the money at that time, but that he would have it later that night. After smoking crack cocaine with Flournoy, [Smith] left. Later that night, [Smith], accompanied by his girlfriend, Lekina Smith, returned to Flournoy’s residence. He carried a sawed-off .22 caliber rifle concealed under his shirt. [Smith] again asked Flournoy for the money, and Flournoy said he did not have it. [Smith] told his girlfriend, Lekina, to get out of the way, and then he pointed his rifle at Flournoy and said, ‘Flint [Flour- *266 noy], I have something for you.’ He shot Flournoy, who was unarmed, in the chest as Flournoy begged him not to shoot. Flournoy attempted to escape, but fell in the yard of his residence and later died from a bullet wound in his chest. After shooting Flournoy, [Smith] turned on the other occupants of the home, none of whom was armed. He shot Theresa Helms six times as she tried to flee; she died at the scene from several gunshot wounds to her chest. He shot David Bennett as Bennett sat in a chair in one of the bedrooms of the residence; Bennett died at the scene from a gunshot wound to his head. [Smith] attempted to shoot Derrick Gross, but his rifle jammed. As Gross and [Smith] wrestled over the gun, the appellant tried to get a knife from his girlfriend so he could stab Gross. Gross escaped. After the shootings, [Smith], accompanied by his girlfriend, fled the scene; he made arrangements for an acquaintance to hide the rifle, changed clothing, and attempted to hide from the police. He was apprehended by the police at approximately 2:00 a.m. the following morning, when he was discovered hiding in his father’s house. After being advised of his rights, he confessed to the shootings. The prosecution’s evidence also tended to show that [Smith] had bragged to other inmates in the county jail that he would beat the capital charge because of his mental condition. It further indicated that the appellant had made statements that the shootings were the result of a drug deal and that he intended to shoot all persons in the residence in order to eliminate all witnesses to the shootings.
“At trial, [Smith] admitted shooting and killing the three victims, but he contended that he did not intend to kill them. He claimed that he was not ‘in his right mind’ at the time of the shootings and that he just ‘snapped,’ for three reasons: (1) he had been on a binge, smoking crack cocaine and drinking alcohol; (2) he was under duress because he owed $27,000 to his narcotics supplier, a person he could only identify as a Jamaican named ‘Tony,’ who lived in Florida and who, he claimed, carried an Uzi automatic weapon and had threatened to kill [Smith’s] mother if he did not get his money; and (3) he was angry because Flournoy had called his girlfriend a “whore’ and ‘bitch.’ ”
213 So.3d at 124-25.
In Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the United States Supreme Court reversed its holding in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and held that it was a violation of the Eighth Amendment to the United States Constitution to execute a mentally retarded individual. The Court stated:
“We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our ‘evolving standards of decency,’ we therefore conclude that such punishment is excessive and that the Constitution ‘places a substantive restriction on the State’s power to take the life’ of a mentally retarded offender. Ford [v. Wainwright], 477 U.S. [399,] 405 [ (1986) ].”
536 U.S. at 321. The Supreme Court declined to adopt a standardized definition of mental retardation; instead, it left that decision to the individual states.
Alabama has yet to enact legislation addressing this issue. However, the Alabama Supreme Court, in Ex parte Perkins, 851 So.2d 453 (Ala.2002), adopted the most *267 liberal definition of mental retardation as defined by those states that have legislation barring the execution of a mentally retarded individual. According to Perkins, to be considered mentally retarded a defendant must show: (1) significant sub-average intellectual functioning—i.e., an IQ of 70 or below; (2) significant or substantial deficits in adaptive behavior; and (3) that these problems manifested themselves during the developmental period— i.e., before the age of 18.
“All three factors must be met in order for a person to be classified as mentally retarded for purposes of an Atkins [v. Virginia, 536 U.S. 304 (2002),] claim. Implicit in the definition is that the sub-average intellectual functioning and the deficits in adaptive behavior must be present at the time the crime was committed as well as having manifested themselves before age 18. This conclusion finds support in examining the facts we found relevant in Ex parte Perkins[, 851 So.2d 453 (Ala.2002),] and Ex parte Smith [, 213 So.3d 214 (Ala.2003),] and finds further support in the Atkins decision itself, in which the United States Supreme Court noted: ‘The American Association on Mental Retardation (AAMR) defines mental retardation as follows: “Mental retardation refers to substantial limitations in present functioning.” ’ 536 U.S. at 308 n. 3 (second emphasis added). Therefore, in order for an offender to be considered mentally retarded in the Atkins context, the offender must currently exhibit subaver-age intellectual functioning, currently exhibit deficits in adaptive behavior, and these problems must have manifested themselves before the age of 18.”
Ex parte Smith, 213 So.3d at 248. In its 2007 opinion in Ex parte Smith, the Alabama Supreme Court emphasized that a reviewing court must give great deference to a circuit court’s findings on mental retardation; it noted that questions based on weight and credibility determinations are better left to trial courts, which have “ ‘the opportunity to personally observe the witnesses and assess their credibility.’ ” Ex parte Smith, 213 So.3d at 253, quoting Smith v. State, 213 So.3d 226, 237 (Ala.Crim.App.2003) (opinion on return to remand) (Shaw, J., dissenting).
In reviewing the experts’ testimony, we keep in mind that “[i]t is not the number of experts, but the credibility of their testimony which the judge must weigh.” Commonwealth v. Prater, 420 Mass. 569, 575, 651 N.E.2d 833, 838 (1995). “ ‘The question of [the defendant’s] mental retardation is a factual one, and as such, it is the function of the factfinder, not this Court, to determine the weight that should be accorded to expert testimony of that issue.’” Atkins v. Commonwealth, 266 Va. 73, 76-77, 581 S.E.2d 514, 515 (2003). Furthermore, Smith has the burden of proving his mental retardation by a preponderance of the evidence. See Morrow v. State, 928 So.2d 315 (Ala.Crim.App.2004).
The circuit court made the following findings of fact after concluding the Atkins hearing:
“On remand from the Alabama Supreme Court, a hearing was held on April 24, 2008, for the Court to determine from the evidence if the defendant, Jerry Jerome Smith, was mentally retarded. The Court has reviewed the transcript of this hearing as well as the testimony of the penalty phase of the trial transcript and finds that [Smith] is not mentally retarded so as to prevent his execution for his multiple crimes.
*268 “To support this finding, the Court relies upon the testimony of Dr. Harry McClaren and Dr. Doug McKeown, who both concluded that [Smith] was not mentally retarded, from a standpoint of Intelligence Quotients, as shown by the tests, and by his social adaptive functioning. Dr. McClaren stated [Smith] has a full scale IQ of 68 and Dr. McKeown stated at the sentencing hearing that [Smith’s] full scale IQ score did not show mental retardation. This Honorable Court has reviewed Dr. McKeown’s testimony in its Opinion, and this Court will not recap his findings. There was ample evidence that [Smith] had the ability to adequately function in society which is shown by his daily activities, his past work history and his ability to communicate. Specifically, he was able to maintain a bank account, to save money, to use medical terms that were not normal for mentally retarded persons to use, and his participation in daily activities and other work showed his planning and thought processes. As Dr. McClaren stated his adaptive functioning was in the high borderline range or borderline range. Dr. McClaren concluded at the hearing that [Smith] is not mentally retarded and gave his reasons for his opinion.
‘“Q—So, in conclusion, based on your psychological evaluation of Mr. Smith, do you have an opinion as to whether or not he is mentally retarded?
“ ‘A—Yes, I do.
“ ‘Q—What is your opinion?
‘“A—That he is not mentally retarded.
“ ‘Q—Again, why?
“ ‘A—For a number of reasons. I can tell you what I think. No doubt, that he had some IQ scores, in fact, all the IQ scores that I know in the school records that indicate school scores measured IQ that would be indicative of mild, mental retardation, if they were not spuriously lowered by things such as exposure to domestic violence, poverty, cultural deprivation, ethnicity, perhaps intoxication. He told me that he was accustomed to late elementary, early middle school years to take a half pint of gin to school and do that at recess. I can’t help to think that would have an adverse affect, if that was true, on his measured IQ’s, especially later on. Also, it was clear from talking to his brother, Jimmy, and directly observing one of his half brothers that he had been exposed to domestic violence of a serious nature as a young child, that he had a family history of depression, and had made suicide attempts in his life eating rat poison, attempted another time Jimmy told me—I had not heard of—he may have wanted to kill himself with exhaust fumes and also huffing gas.’
“Dr. McClaren also stated that [Smith’s] substance abuse and other matters alluded to in the above testimony would affect cognitive functioning such that the IQ becomes lower not because of retardation but because of these external influences.
“For the foregoing reasons, there is abundant evidence for this Court to conclude that [Smith] is not mentally retarded and does not meet the criteria as established by the United States Supreme Court.”
(C.R. 90-92.)
At the Atkins hearing, Smith presented the testimony of Dr. John Goff, a clinical psychologist and neuropsychologist. Dr. Goff testified that he conducted an intellectual assessment of Smith by performing the Wechsler Abbreviated Scale of Intelli *269 gence. He also examined Smith’s school records, Department of Human Resource records pertaining to Smith and his family, interviewed Smith’s relatives and friends, and spoke with one of Smith’s school teachers. Dr. Goff testified that, based on his testing, Smith has a full-scale IQ of 67, a verbal IQ of 69, and a performance IQ of 72. There was no evidence to indicate that Smith was malingering, Dr. Goff said.
Dr. Goff testified that to evaluate Smith’s adaptive functioning he performed several tests—the Second Edition of the Adaptive Behavior Assessment System and the Fourth Edition of the Wide Range Achievement test. Essentially these tests consisted of asking people close to Smith if Smith was able to perform certain skills and tasks. To complete these tests, Dr. Goff spoke to Smith’s brother, Jimmy Smith, and Smith’s aunt, Sharon Turner. Dr. Goff testified that everyone that he spoke to about Smith said that Smith was “functioning at a relatively low level.” Dr. Goff testified that Turner said that Smith had to be reminded to bathe, that he would wear the same clothes over and over again, that he did not take care of his personal hygiene, and that he could not read. (Return to fourth remand record p. 67.) It was Dr. Goffs opinion that Smith was “mildly mentally retarded.”
To rebut the testimony of Dr. Goff, the State presented the testimony of Dr. Harry McClaren, a forensic psychologist. Dr. McClaren testified that he spoke to Smith approximately 3 times for a total of 8 to 10 hours, that he spoke with the 2 detectives who had worked on the triple-homicide investigation, that he spoke with 1 of Smith’s teachers and 3 of Smith’s half brothers, and that he reviewed Smith’s prison records. He also said that he performed the Wechsler Adult Intelligence Scale, Third Edition, on Smith and that Smith obtained a full-scale IQ of 68, a verbal IQ of 73, and a performance IQ of 68. Dr, McClaren said that he did not perform the Wechsler Abbreviated Seale of Intelligence on Smith because that test is not as accurate.
In assessing Smith’s adaptive functioning, Dr. McClaren had one of the correctional officers who had close contact with Smith perform a test called the Scales of Independent Behavior, Revised. This officer had the opportunity to observe Smith in general population, in segregation, and on death row. Smith scored in the 80s on this test, which, Dr. McClaren said, is comparable to scoring a full-scale IQ in the 80s.
Dr. McClaren testified that Smith had an extensive work history that included working as a temporary construction worker; working at a shipyard doing general labor; working as a roofer with his uncle, where he used a jackhammer needle gun to remove paint; and working for a paving company. Smith also worked doing storm clean up in Florida and Alabama. Dr. McClaren further testified that Smith told him that, after he was released from prison the first time, he started a business selling crack cocaine. He said that Smith managed his money, that he had a bank account, that he tried to put money in the account every pay day, that he had a common-law wife, that he drove a stick-shift car, and that he had put a diamond cluster ring on lay-a-way and had been making payments. Dr. McClaren also testified that when he met with Smith his appearance was neat and clean and his prison uniform appeared to have been pressed. He said:
“Mr. Smith told me like many prison death row inmates a way to cope with the acuity of things [is] to take care of your hygiene, your clothing, is to put them under the mattress and lay on them, sleep on them, and it presses *270 things, sometimes really nicely. He had done a good job with them.”
(On return to fourth remand record p. 116.) Dr. McClaren also testified that he was impressed with Smith’s use of vocabulary during the interview because he used words that Dr. McClaren did not expect a mentally retarded individual to use. For instance, Dr. McClaren testified, “[Smith] mentioned that he had had a spinal fusion, cervical, he used that word once, but later called it like C-5 and C-6 or thereabouts.” Also, Smith told Dr. McClaren that his sister had HIV and that it had “affected her immune system.” The following then occurred:
“Q [Prosecutor]: Based on all the pieces of the mosaic that we’ve been talking about today, how would you characterize or describe Mr. Smith’s adaptive functioning?
“A [Dr. McClaren]: I would think it would be somewhere in the certainly high borderline range or borderline range, like with a standard score where he might be in the bottom ten percent or so of the population, maybe bottom five, but not in the bottom two and a-half percent such as would be the rough estimate.
“Q [Prosecutor]: We may have already addressed this, but did you come to any conclusion regarding his adaptive function prior to the age of eighteen?
“A [Dr. McClaren]: It appeared to me that it was worse than it has been post-eighteen, significantly worse.
“Q [Prosecutor]: So is there an improvement involved in something like that?
“A [Dr. McClaren]: Yes.
“Q [Prosecutor]: Is it possible, I believe Dr. Goff testified that people can be mentally retarded when they are young, and kind of—I don’t know what a good word is—move out of that category.
“A [Dr. McClaren]: Yes. In the DSM-IV [Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition], it would talk about how mental retardation is not a life long condition, and it is more likely that the adaptive functioning might go up, so the person is not still meeting the criteria at an older age than it is the IQ is going to go up. But there were some odd things about the testing too.
“Q [Prosecutor]: So, in conclusion, based on your psychological evaluation of Mr. Smith, do you have an opinion as to whether or not he is mentally retarded?
“A [Dr. McClaren]: Yes, I do.
“Q [Prosecutor]: What is your opinion?
“A [Dr. McClaren]: That he is not mentally retarded.”
(On return to fourth remand record pp. 142-44.)
It is clear that the circuit court chose to base its decision on Dr. McClaren’s testimony and not on Dr. Goffs testimony. The main difference in the two experts’ testimony was in the area of Smith’s “adaptive functioning.” Dr. Goff testified that he had Smith’s brother, Jimmy Smith, and Smith’s aunt, Sharon Turner, complete tests that would help evaluate Smith’s adaptive functioning. Dr. Goff testified that he discounted Turner’s results because he felt that she was comparing Smith to her own son who was mentally retarded. Also, Dr. Goff said that Jimmy Smith could not read and that he had to assist him in completing the test. Dr. Goffs testimony appeared to focus on Smith’s historic mental-health functioning and not his present functioning.
However, in sharp contrast, Dr. McClaren’s testimony consisted of testimony related to Smith’s present mental functioning. He relied on his own contact with Smith as an adult, his contact with individ *271 uals who had had recent contact with Smith, and the evaluation of a correctional officer who had close contact with Smith while Smith was incarcerated.
Also, Smith testified in his own behalf at the guilt phase of his trial, and the circuit court judge had the opportunity to observe Smith. We have reviewed Smith’s testimony, and we find no indication that Smith is mentally retarded based on the factors set out in Ex parte Perkins. Indeed, Smith appeared at times to be articulate.
The circuit court’s conclusion that Smith is not mentally retarded is more than supported by the record. Accordingly, we affirm the circuit court’s finding. There is no constitutional bar to Smith’s sentence of death.
We now address the remaining issues that were raised in Smith’s brief that was filed with this Court after the new penalty phase was conducted and when the case was before this Court on return to third remand.[1] Because we reversed the case on the issue of mental retardation, we did not address the other issues raised in Smith’s brief at that time.

Remaining Penalty-Phase Issues

Standard of Review

Smith has been sentenced to death. According to Rule 45A, Ala.R.App.P., this Court must review the proceedings for plain error. Rule 45A, Ala.R.App.P., states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
In determining the scope of Rule 45A, Ala.R.App.P., this Court has stated:
“ ‘In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term “plain error” adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L,Ed.2d 367 (1983). See also Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). Plain error is error that has or probably has adversely affected a substantial right of the appellant, Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack. The failure to object at trial weighs against any claim of prejudice an appellant may make. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991).’ ”
Frazier v. State, 758 So.2d 577, 582 (Ala.Crim.App.1999), quoting Bush v. State, 695 So.2d 70, 87 (Ala.Crim.App.1995). “While the failure to object does not bar our review in a death penalty case, it weighs against any claim of prejudice.” Smith v. State, 908 So.2d 273, 282 (Ala.Crim.App.2000).
I.
Smith first argues that the prosecutor exercised his peremptory strikes in a discriminatory manner in violation of Bat-son v. Kentucky, 476 U.S. 79, 106 S.Ct. *272 1712, 90 L.Ed.2d 69 (1986). He also argues that the prosecutor’s voir dire examination was discriminatory because he focused on the black prospective jurors.
In Batson the United States Supreme Court held that it was a violation of the Equal Protection Clause to remove black prospective jurors from a black defendant’s jury based solely on their race. This holding was extended to white jurors in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); to defense counsel in criminal eases in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); and to gender-based strikes in J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
The United States Supreme Court has cautioned that we must afford a trial court great deference when evaluating the trial court’s ruling on discriminatory intent.
“Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson [v. Kentucky ], the finding ‘largely will turn on evaluation of credibility.’ 476 U.S. [79], at 98, n. 21 [ (1986) ]. In the typical peremptory challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor’s state of mind based on demeanor and credibility lies ‘peculiarly within a trial judge’s province.’ Wainwright v. Witt, 469 U.S. 412, 428 (1985), citing Patton v. Yount, 467 U.S. 1025, 1038 (1984).”
Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). The Court further explained in Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003):
“Deference is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations. ‘[I]f an appellate court accepts a trial court’s findings that a prosecutor’s race-neutral explanation for his peremptory challenges should be believed, we fail to see how the appellate court nevertheless could find discrimination. The credibility of the prosecutor’s explanation goes to the heart of the equal protection analysis, and once that has been settled, there seems nothing left to review.’ [Hernandez v. New York, 500 U.S. 352] at 367 [(1991)].
“In the context of direct review, therefore, we have noted that ‘the trial court’s decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal’ and will not be overturned unless clearly erroneous. Id., at 364.”
537 U.S. at 339-40.
When evaluating a Batson claim, we keep in mind the following:
“Under our Batson jurisprudence, once the opponent of a peremptory challenge has made out prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination. Hernandez v. New York, 500 U.S. 352, 358-59 (1991) (plurality *273 opinion); id., at 375 (O’Connor, J., concurring in judgment); Batson, supra at 96-98. The second step of this process does not demand an explanation that is persuasive, or even plausible. ‘At this [second] step of the inquiry, the issue is the facial validity of the prosecutor’s explanation. Unless a discriminatory intent is inherent in the prosecutor’s explanation, the reason offered will be deemed race neutral.’ Hernandez, 500 U.S., at 360 (plurality opinion); id., at 374 (O’Connor, J., concurring in judgment).”
Purkett v. Elem, 514 U.S. 765, 767-68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). “A ‘legitimate reason’ is not a reason that makes sense, but a reason that does not deny equal protection.” 514 U.S. at 769. “ ‘[T]he reasons given for striking a juror are not required to rise to the level justifying a challenge for cause.’ ” Pollard v. State, 549 So.2d 593, 596 (Ala.Crim.App.1989).
In this case, the record shows that the State used 11 of its peremptory strikes to remove black prospective jurors, 1 strike to remove an Asian-American prospective juror, and its last strike to remove a white prospective juror.[2]
Although the circuit court did not make a formal finding that Smith had proven a prima facie case of discrimination, it required the State to give its reasons for removing the black prospective jurors.
“[W]hen the trial court calls upon the prosecutor for an explanation, without expressly finding a prima facie case, we will proceed directly to evaluate the sufficiency of the ensuing explanation. Where the trial court requires the prosecution to explain its peremptory challenges without first finding the existence of a prima facie showing of discrimination, we may fairly conclude that ‘the enquiry implied such a finding, and shifted the burden of justification to the prosecutor.’ People v. Turner, 42 Cal.3d 711, 719, 230 Cal.Rptr. 656, 660, 726 P.2d 102, 106 (1986).”
Williams v. State, 548 So.2d 501, 504 (Ala.Crim.App.1988).
The prosecutor gave the following reasons for removing the minority prospective jurors:
B.G.[3]—This prospective juror stated that he knew a lot of Smith’s relatives and said during voir dire that he would rather not sit on the case. He also stated that the fact that he knew so many of Smith’s relatives “might come into his mind.”
V.N.—This prospective juror stated in the juror questionnaire that she was opposed to the death penalty. Her answers during voir dire on the burden of proof were inconsistent. She first said that she would require 100% proof before she could vote to impose the death penalty and when questioned further indicated that she could follow the law.
C.N.—This prospective juror stated during voir dire that he would require 100% proof to impose the death penalty and that he could not follow the court’s instructions on “beyond a reasonable doubt.”
P.W.—This prospective juror wavered about the level of proof she would require to impose the death penalty. She indicated during voir dire that she had used another name, and the evidence was going to show that Smith had given *274 a false name to police the day before the murders. On the juror questionnaire, she responded that she was opposed to the death penalty.[4]
T.M.—This prospective juror stated on the juror questionnaire that she was opposed to the death penalty and wavered about the level of proof she would need to impose the death penalty. At one point she said that she could not follow the standard of proof beyond a reasonable doubt.
M.S.—This prospective juror stated that he knew every witness that the defense intended to call.
J.H.M.—This prospective juror indicated on the juror questionnaire that he was opposed to the death penalty and said that he would require 100% proof before he could vote to impose the death penalty.
F.R.—This prospective juror stated during voir dire that he had served on a criminal jury that had acquitted a defendant and that he believed that a gun could automatically fire. This prospective juror also responded in the questionnaire that the death penalty should only be used in rare cases.
V.M.—This prospective juror stated that she knew a defense witness and she laughed during the entire voir dire examination.
C.P.—This prospective juror stated during voir dire that he had retained defense counsel to represent his son in a criminal matter.
J.M.—This prospective juror was on felony probation and had a “deferred prosecution” in Texas for a drug-possession offense.
B.M.—This prospective juror said that if she had any doubt she could not vote for the death penalty. Also, this prospective juror appeared indecisive and had difficulty answering questions posed during voir dire.
After the prosecutor stated his reasons, Smith asserted that the entire voir due examination was focused on the black veniremembers and that the State had not articulated sufficient reasons for striking prospective jurors V.M. and B.M. The prosecutor then responded:
“If I could respond. First, of all, Judge, I’d like to respond in reference to my questions to the panel yesterday. I need to make sure the record is very clear. The panel was on the left side and the right side. [Defense counsel] said I asked every black, I targeted every black. That is not true. I didn’t ask black males questions. You had [C.N.]. You had [F.R.]. You had some others on [the] other side. I didn’t elicit that. I picked some people.
“And I want the Court to understand and the appellate record when I am asking the questions on voir dire, I am looking at them eyes and their faces, and how they respond to questions, are they shaking their head, are they rolling their eyes, are they giving you a perplexed look. And the people I addressed were the ones who did that. Second of all, [V.N.] is not a black female. Okay. She *275 is an oriental. And she responded, and I went to her.
“And, Judge, everyone I asked questions to—he says I targeted blacks—I asked them on the record are you having a problem, you’ve got a question about it, and they all responded they did. They had a question about the 100 percent. They said that is what they wanted. So it wasn’t I just asked a question and single handedly sought out African-Americans.
“Plus, on the right side, I did ask some white jurors too. And it’s not because I asked black, white, or oriental. I asked the ones that were giving me a response as I was looking at them by the motions I had already talked about.
“I’d like to go back to what [defense counsel] mentioned too on [V.M.]. [V.M.], my notes, once again, [an assistant district attorney] struck the jury. I didn’t. She said something about it. She couldn’t decide one way or the other. She sat in this room in here when we were doing voir dire and she laughed constantly. She thought everything was funny. If the Court will remember, she laughed three or four times on every response.
“No other juror came in here and laughed about any response in the nature that the State seeks to put this defendant to death or life without parole. She’s the only juror that laughed on serious questions.
“Next, she also mentioned [that a defense witness] goes to her church. She laughed about that. She’s been at our church over five years. She laughed about that. She laughed about the burden. She laughed about [the defense witness] being the head of the Christian Youth Center for over five years. So that was the reasons on her.
“[B.M.], if you recall, [B.M.] came in here, and she sat here. And when she was asked questions of all the jurors we had, she went, well, she paused. She went ‘uh.’ She couldn’t make up her mind to any simple questions that were asked.
“Every other juror that came in here that were asked questions by the defense had no problem responding by giving an answer. And, once again, my note said if she had any doubt, she could not vote death.”
(R. 287-89.)
This Court has held that the following reasons are race neutral: “The fact that a prospective juror knows the defendant or his family is a valid race-neutral reason for striking that juror.” Temmis v. State, 665 So.2d 958, 953 (Ala.Crim.App.1994). Opposition to the death penalty is a race-neutral reason for removing a juror. See Wood v. State, 715 So.2d 812 (Ala.Crim. App.1996); Jackson v. State, 640 So.2d 1025 (Ala.Crim.App.1992). “When one of the jurors knows one of the witnesses involved in the case, that is a race neutral reason for the strike of that juror.” Williams v. State, 620 So.2d 82, 85 (Ala.Crim.App.1992). Previous service on a jury that acquitted a criminal defendant is a race neutral reason. See Sumlin v. State, 615 So.2d 1301, 1302 (Ala.Crim.App.1993). “The fact that a family member of the prospective juror has been prosecuted for a crime is a valid race-neutral reason.” See Yelder v. State, 596 So.2d 596, 598 (Ala.Crim.App.1991). Striking a juror who has a prior conviction is a race-neutral reason. See Jackson v. State, 549 So.2d 616 (Ala.Crim.App.1989). “ ‘The fact that a veniremember is evasive or ambiguous in answering questions on voir dire is certainly a valid reason for striking that member from the venire.’” Yelder, 596 So.2d at 598, quoting Mitchell v. State, 579 So.2d *276 45, 49 (Ala.Crim.App.1991). “[A] potential juror’s demeanor may form the basis for a valid race-neutral strike.” McElemore v. State, 798 • So.2d 693, 697 (Ala.Crim.App. 2000). •
A review of the voir dire examination of the prospective jurors shows no indication that the prosecutor exercised disparate treatment or that he focused on questioning the black prospective jurors. The prosecutor stated that he concentrated on the demeanor of the prospective jurors during the examination. Necessity dictates that we must give great deference to the trial judge who was there and witnessed the prospective jurors’ conduct during voir dire. Accordingly, we cannot say, based on the record before us, that the circuit court exceeded its considerable discretion in denying Smith’s Batson motion.
II.
Smith next argues that the circuit court erred in denying his motion for a mistrial after the veniremembers were exposed to prejudicial comments by a family member of one of the victims.
The record shows that during voir dire defense counsel informed the court that some family members of one of the victims were in the courtroom. The following discussion took place:
“[Defense counsel]: Judge, she just made a statement, she said, ‘he took my son’s life.’
“[Prosecutor]: Who?
“[Defense counsel]: The lady on the second row said, ‘he needs to die, he took my son’s life.’ And I didn’t know she wasn’t a juror. And she is sitting out there—”
(R. 200.) The prosecutor suggested that the circuit court poll the prospective jurors to see if any of them had heard the comment. The first two prospective jurors were questioned outside the presence of the other members of the venire. Both indicated that they had heard the individual say only that “he took my son’s life.” The court then questioned all of the prospective jurors together. Five members of the venire indicated that they had heard the entire statement. The following occurred:
“The Court: Now, my question to all of you, in fact, is whether or not now, you know, those that even didn’t hear the last part, you’ve heard now from other jurors what the lady did, in fact, say, the complete statement, the fact that you heard that, does that affect you in any manner in this case? Can you still be fair, or would you be more sympathetic to the victim’s family because they made that statement? If it affects you whatsoever, that particular statement, in being fair and objective in this case, then, obviously, you cannot serve as a juror. And I would excuse you. Okay. There is nobody that says it would affect them, okay.”
(R. 209-210.)
Further questioning revealed that one prospective juror, M.T., had also spoken with the mother of one of the victims. This prospective juror stated:
“[M.T.]: Like I said, we was talking on the corner, and she was talking about voting. So I assumed that is what she was here for. But then she said she wouldn’t be here if she didn’t just have to. And I said, ‘well, I probably wouldn’t be here if I didn’t have to either.’ And she said, ‘it’s my son’s trial’ And at that time, I, you know, was afraid to hear too much of anything else. But she said the Lord giveth and the Lord taketh away. And I have to be thankful for the time I’ve had with him.
“The Court: And does that affect you in any manner?
*277 “[M.T.]: You know, it’s hard for me to sit here and say that it doesn’t, because, to tell you the truth, it makes me feel like she’s accepted what has happened, and, you know, she’s found some comfort in her beliefs.
“The Court: So, actually, what you are saying is that—
“[M.T.]: It’s not going to make a difference in my decision, I don’t think. But, you know, to sit here and tell you that absolutely it wouldn’t, I can’t say that.
“The Court: Okay. Is there a challenge for cause or not? Actually—
“[Prosecutor]: Not from me.
“The Court: Okay.
“[Defense counsel]: No, Your Honor.”
(R. 212-13.) The defense counsel then renewed his request for a mistrial.
As this Court has stated:
“ ‘ “[A] mistrial is a drastic remedy, to be used only sparingly and only to prevent manifest injustice.” Ex parte Thomas, 625 So.2d 1156, 1157 (Ala.1993). A mistrial is an extreme measure that should be taken only when the prejudice cannot be eradicated by instructions or other curative actions of the trial court. Nix v. State, 370 So.2d 1115, 1117 (Ala.Crim.App.), cert. denied, 370 So.2d 1119 (Ala.1979). If an error can be effectively cured by an instruction, a mistrial is too drastic a remedy and is properly denied. Thompson v. State, 503 So.2d 871, 877 (Ala.Crim.App.1986),’
“Ex parte Lawrence, 776 So.2d 50, 55 (Ala.2000). ‘There is a prima facie presumption against error when the trial court immediately charges the jury to disregard improper remarks or answers.’ Garrett v. State, 580 So.2d 58, 59 (Ala.Crim.App.1991),”
Walker v. State, 932 So.2d 140, 152-53 (Ala.Crim.App.2004).
All the prospective jurors indicated that the comments would not impact their ability to be impartial. Prospective juror M.T. did indicate that her conversation with one of the family members “may” affect her decision. However, the circuit court asked if defense counsel wished to have M.T. removed for cause and counsel declined to accept the trial court’s invitation. If any error occurred by failing to remove M.T. for cause, that error was invited. “The doctrine of invited error applies to death-penalty cases and operates to waive any error unless the error rises to the level of plain error.” Snyder v. State, 893 So.2d 488, 518 (Ala.Crim.App.2003). The record shows that M.T. was removed for cause on another basis and did not serve on Smith’s jury.
As we stated in Calhoun v. State, 932 So.2d 923 (Ala.Crim.App.2005):
“The Alabama Supreme Court in Be-thea v. Springhill Memorial Hospital, 833 So.2d 1 (Ala.2002), returned to the harmless-error analysis when reviewing a circuit court’s refusal to remove a prospective juror for cause. The Supreme Court stated:
‘“The application of a “harmless-error” analysis to a trial court’s refusal to strike a juror for cause is not new to this Court; in fact, such an analysis was adopted as early as 1909:
“ ‘ “The appellant was convicted of the crime of murder in the second degree. While it was error to refuse to allow the defendant to challenge the juror C.S. Rhodes for cause, because of his having been on the jury which had tried another person jointly indicted with the defendant, yet it was error without injury, as the record shows that the defendant challenged said juror peremptorily, and that, when the *278 jury was formed the defendant had not exhausted his right to peremptory challenges.”
“ ‘Turner v. State, 160 Ala. 55, 57, 49 So. 304, 305 (1909). However, in Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled on other grounds, Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court stated, in dicta, that “[t]he denial or impairment of the right is reversible error without a showing of prejudice.” (Emphasis added [in Bethea].) Some decisions of this Court as well as of the Alabama Court of Criminal Appeals reflect an adoption of this reasoning. See Dixon v. Hardey, 591 So.2d 3 (Ala.1991); Knop v. McCain, 561 So.2d 229 (Ala.1989); Ex parte Rutledge, 523 So.2d 1118 (Ala.1988); Ex parte Beam, 512 So.2d 723 (Ala.1987); Uptain v. State, 534 So.2d 686, 688 (Ala.Crim.App.1988) (quoting Swain and citing Beam and Rutledge); Mason v. State, 536 So.2d 127, 129 (Ala.Crim.App.1988) (quoting Uptain).
“ ‘... [T]his Court has returned to the “harmless-error” analysis articulated in the Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and [United States v.] Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), decisions. Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an “impartial” jury, see Ala. Const.1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.
“‘In this instance, even if the Be-theas could demonstrate that the trial court erred in not granting their request that L.A.C. be removed from the venire for cause (an issue we do not reach), they would need to show that its ruling somehow injured them by leaving them with a less-than-impartial jury. The Betheas do not proffer any evidence indicating that the jury that was eventually impaneled to hear this action was biased or partial. Therefore, the Betheas are not entitled to a new trial on this basis.’
“833 So.2d at 6-7 (footnotes omitted). See also Dailey v. State, 828 So.2d 340 (Ala.2001). As was the case in Bethea, Calhoun offers no evidence that the jury ultimately impaneled was biased; therefore, if error occurred it was harmless.”
932 So.2d at 944-45. Thus, any error in the failure to remove M.T. on the basis of her conversation with a victim’s family member was harmless.
Based on the record before us we cannot say that the circuit court erred in denying Smith’s motion for a mistrial.
III.
Smith next argues that the circuit court erred in allowing what he contends is evidence of a nonstatutory aggravating circumstance to be introduced at the penalty phase. Specifically, he asserts that the circuit court erred in allowing evidence of prior bad acts to be admitted.
A.
First, Smith argues that the circuit court should not have allowed a police officer to testify about prior bad acts that Smith had committed several days before the triple homicide.
Officer Ted Yost, a former officer with the Headland Police Department, testified at the penalty phase that a few days before the murders he stopped a vehicle driven by Smith, that Smith gave him a false name, that he found a pistol during a *279 search of the vehicle, and that Smith was arrested for carrying a concealed weapon and for contributing to the delinquency of a minor—several minors were in the vehicle when Smith was stopped by Yost. He also testified that while at the police station Smith asked to use the restroom and escaped.[5]
Before Officer Yost testified, Smith objected and stated that his testimony would be highly prejudicial and would have no relevance to the aggravating circumstances that the State was relying on to seek the death penalty—namely, (1) that Smith had previously been convicted of another capital offense or a felony involving the use or threat of violence; and (2) that Smith knowingly created a grave risk of death to many persons. The prosecutor then stated that he was offering the evidence to rebut Smith’s defense that he was mentally retarded. Officer Yost was also called out of order, the prosecutor said, because Yost lived out of town and the State and the circuit court were aware that Smith was relying on a defense of mental retardation.
At a penalty phase in a capital-murder case, the State has the burden of proving the existence of any applicable aggravating circumstances and the burden of disproving the factual existence of any mitigating circumstances that are presented by the defendant. The State has the burden of proving the aggravating circumstances “beyond a reasonable doubt.” § 13A-5-45(e), Ala.Code 1975. Also, “when the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence.” See § 13A-5-45(g), Ala.Code 1975.
Also, the evidence relating to Smith’s prior bad acts was introduced at the penalty phase and not the guilt phase. Section 13A-5-45(d), Ala. Code 1975, states:
“Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama.”
See Burton v. State, 651 So.2d 641 (Ala.Crim.App.1993). “In the conduct of the sentencing hearing, the rules of evidence should be relaxed....” Harris v. State, 352 So.2d 479, 495 (Ala.1977). “ ‘Alabama recognizes a liberal test of relevancy....’” Gavin v. State, 891 So.2d 907, 965 (Ala.Crim.App.2003), quoting Hayes v. State, 717 So.2d 30, 36 (Ala.Crim.App.1997). The circuit court committed no error in allowing evidence of Smith’s prior bad acts to be admitted at the penalty phase.
B.
Smith next argues that the circuit court failed to comply with Ex parte Mi *280 nor, 780 So.2d 796 (Ala.2000), by giving a limiting instruction on the use of the evidence regarding his prior bad acts. In Minor, the Alabama Supreme Court held that it was plain error for a trial court to fail to sua sponte instruct a jury that the evidence relating to a prior bad act could only be used for impeachment purposes and not as substantive evidence of guilt when that evidence was introduced solely for impeachment purposes. In Snyder v. State, 893 So.2d 482 (Ala.2001), the Alabama Supreme Court limited its holding in Minor and said that whether the failure to give a limiting instruction is reversible error must be determined on a case-by-case basis. Minor has not been extended to sentencing hearings, in which the sole question is not the defendant’s guilt.
C.
Smith also asserts that it was reversible error for the prosecutor to argue in his opening statement that the evidence would prove that Smith had a prior conviction for breaking and entering a vehicle and stealing a weapon and ■ for stealing women’s clothes from a shopping mall and hitting a security guard.[6] However, at the penalty phase, he argues, the State only offered documentary evidence that Smith had been convicted of assault in the first degree for shooting Judson Threets. Smith argues that according to Ex parte Whisenhant, 482 So.2d 1247 (Ala.1984), he is entitled to a new penalty-phase hearing.
No objection was made to the prosecutor’s comments in his opening statement; therefore, we review this claim for plain error. See Rule 46A, Ala.R.App.P.
The Alabama Supreme Court, in Whi-senhant, reviewed this Court’s holding that reversible error occurred when the prosecutor in his opening statement in the penalty phase of a capital-murder trial commented on Whisenhant’s prior criminal acts.[7] The Supreme Court stated:
“The record indicates that during his opening statement at the penalty phase of the tidal, the state’s attorney made references to criminal acts allegedly committed by Whisenhant on prior occasions. No party had introduced evidence of these alleged crimes during the guilt phase of the trial and the state failed to introduce any evidence regarding these prior criminal acts during the penalty phase of the trial. At the penalty phase, the defense rested without offering any evidence.
“The state’s attorney moved to reopen its case to allow him to introduce evidence of the prior criminal acts, but the trial court denied the motion. The state argued at trial, and now on appeal, that it reserved evidence regarding the prior criminal acts for use during its anticipated rebuttal to the defendant’s evidence at the trial’s penalty phase. The state argues that because Whisenhant followed the unexpected and unusual strategy of offering no evidence of mitigating circumstances at the trial’s penalty phase, the equally unusual procedure of allowing the state to reopen its case was justified. The Court of Criminal Appeals held that remarks by the prosecutor which accuse the defendant of the commission of a crime other than that for which he is on trial and which are unsupported by any evidence in the case *281 require reversal. Bevins v. State, 39 Ala.App. 228, 229, 97 So.2d 572, cert. denied, 266 Ala. 695, 97 So.2d 574 (1957); Moreland v. State, 373 So.2d 1259, 1262, 1263 (Ala.Cr.App.1979), Whisenhant v. State, 482 So.2d 1225 (Ala.Cr.App.1982).
“This is a correct statement of the law relative to ordinary trials to determine guilt, but it has never been applied to the penalty phase of a capital case. The state asks us to hold that the statements made by the state’s attorney during the opening of the penalty phase constituted harmless error, and urges this Court to promulgate a rule of law which would authorize the application of the harmless error rule at sentence hearings in capital cases.
“We cannot tell from a review of the opinion of the Court of Criminal Appeals whether that court applied the harmless error rule or not when it decided to order a new sentence hearing. The state, by requesting that we hold the harmless error rule to be applicable to a sentence hearing in a capital case, necessarily thinks that the Court of Criminal Appeals did not apply the harmless error rule, because the state contends that its sole argument in that court was that the prosecutor’s remarks were harmless. The state asks us to remand the case to that court with directions that it consider the harmless error rule.
“After consideration of the arguments, and as requested by the state, we hold that the harmless error rule does apply in capital cases at the sentence hearing, and we remand this eause to the Court of Criminal Appeals for consideration in light of our holding. See, generally, Washington v. Strickland, 693 F.2d 1243, 1262, 1264-65 (5th Cir.1982) (en banc) (violation of constitutional right to counsel during sentencing phase is harmless if state shows in context of all evidence that ‘it remains certain beyond a reasonable doubt that the outcome of the proceedings would not have been altered but for the ineffectiveness of counsel’).”
Whisenhant, 482 So.2d at 1242-43. On remand from the Supreme Court this Court held: “Inasmuch as the appellant rested at the sentencing hearing without offering any evidence to support the argument made, this court does determine in Whisenhant v. State, 482 So.2d [1225,] 1241 [ (Ala.Crim.App.1982) ], that such argument did constitute harmless error.” Whisenhant v. State, 482 So.2d 1246, 1246 (Ala.Crim.App.1983). Ultimately the Supreme Court found that this Court erroneously applied a standard of review related to the procedural posture of the case and reversed this Court’s decision after finding that the error was not harmless. However, the Supreme Court did not hold that error of this type could never be harmless in the penalty phase of a capital trial. ‘ In fact, Whisenhant is the first Alabama case to recognize that a harmless-error analysis may be applied to the penalty phase of a capital-murder trial.[8]
This case is readily distinguishable from Whisenhant. The greatest distinction is that in Whisenhant it appears that the matter was brought to the trial court’s attention because the State attempted to reopen its case to put on evidence concerning the prior convictions that the prosecutor had referenced during his opening remarks. Here, there was no objection to the prosecutor’s comments. Also, in this *282 case a great deal of evidence was presented at the penalty phase by both the State and Smith, but no evidence was presented at the penalty hearing in Whisenhant. Evidence was introduced in this case indicating that Smith had one prior felony conviction for assault, that Smith frequently used drugs, and that Smith sold drugs. The case-action-summary sheet introduced to prove Smith’s prior conviction for assault in the first degree reflects that Smith was given notice of his “previous convictions” for purposes of sentencing. Smith’s statement to police was also admitted at sentencing. In his statement Smith admitted to shooting the three victims during an attempt to get $1,500 that one of the victims owed him for drugs. Officer Ted Yost testified that Smith was arrested several days before the murders and was charged with carrying a concealed weapon and contributing to the delinquency of a minor.[9] Another witness testified that Smith routinely carried a rifle. Smith also presented evidence indicating that he was addicted to cocaine and that he was under the effects of cocaine at the time he committed the murders. There was an abundance of evidence indicating that Smith had an extensive criminal background. The circuit court instructed the jury that arguments of counsel were not evidence and that only two aggravating circumstances could be considered in the case.[10] “Jurors are presumed to follow the judge’s instructions.” Minor v. State, 914 So.2d 372, 418 (Ala.Crim.App.2004). Based on the circumstances presented in this case, we hold that, although error did occur, the error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); see also Valentine v. State, 688 So.2d 313 (Fla.1996). We are confident that the error in this case did not contribute to the jury’s recommendation of death.
IV.
Smith next argues that numerous instances of prosecutorial misconduct denied him a fair penalty-phase hearing. When evaluating arguments of counsel, we keep in mind the following legal principals:
“ ‘ “In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. If we determine that the argument was improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict.” Smith v. State, 698 So.2d 189, 202-03 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.1997), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997) (citations omitted); Bush v. State, 695 So.2d 70, 131 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997) (citations omitted). “The relevant question is whether the prosecutor’s comments ‘so infected the trial with unfairness as to make the *283 resulting conviction a denial of due process.’” Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 687, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial. Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). “Prose-cutorial misconduct is subject to a harmless error analysis.” Bush v. State, 695 So.2d at 131 (citations omitted); Smith v. State, 698 So.2d at 203 (citations omitted).’
“Simmons v. State, 797 So.2d 1134, 1161-62 (Ala.Crim.App.1999) (opinion on return to remand). We must view the challenged arguments in the context of the entire trial and not in the abstract. See Duren v. State, 590 So.2d 360 (Ala.Crim.App.1990); Whitlow v. State, 509 So.2d 252 (Ala.Crim.App.1987). It is proper for a prosecutor to argue any legitimate inference that may be drawn from the evidence. See Snyder v. State, 893 So.2d 488 (Ala.Crim.App.2003).”
Belisle v. State, 11 So.3d 256, 302-03 (Ala.Crim.App.2007).
Smith failed to object to any of the alleged instances of prosecutorial misconduct. Thus, we review those claims for plain error. See Rule 45A, Ala.R.App.P. “While the failure to object does not bar our review in a death penalty case, it weighs against any claim of prejudice.” Smith v. State, 908 So,2d 273, 282 (Ala. Crim.App.2000).
Aso, the court instructed the jury that arguments of counsel were not to be considered as evidence. The court gave the following charge at the beginning of the penalty phase:
“Now, you need to realize that the statements made by the attorneys are not evidence in the case. The only evidence you consider is that that comes from the witness stand or the matters allowed to you to be introduced by the Court to you for you to view, such as documents and other things like that.”
(R. 295.) See also Bonner v. State, 921 So.2d 469, 473 (Ala.Crim.App.2005); Simmons v. State, 797 So.2d 1134, 1162 (Ala.Crim.App.1999).
A.
Smith first argues that the prosecutor personally vouched for the legitimacy of the death penalty when he made the following argument:
“This is not a difficult case. I know as I stood there on voir dire—I’m almost done. I promise. I know you are tired—and I looked at you and I said, if I had to prove to you beyond all doubt, one hundred percent, am I going to get a fair trial. And all of you said, no, you won’t get a fair trial, and we won’t make you do that. And I said, as your District Attorney, I know this is a death penalty case.
“And you were looking at me, Valeska [the prosecutor], we want to be sure. We want the evidence. We want to know we are right before we give you based on the evidence what you are asking for in this case a sentence to Judge Little for this defendant of death.
“You’ve got it. You have heard it. You have listened to it. And we have proved it. I know it’s hard.”
(R. 1266-67; emphasis added.)
We have held that a prosecutor’s arguments that are prefaced with “I believe,” “I feel,” or “I have no doubt” do not automatically amount to reversible error.
*284 In Ex parte Rieber, 668 So.2d 999 (Ala.1996), the Alabama Supreme Court stated:
“[W]e view those comments that the prosecutor prefaced with ‘I think,’ ‘I believe;’ ‘I feel,’ ‘I am satisfied,’ and T have no doubt,’ as expressing his reasonable impressions from the evidence. The prosecutor was allowed to argue every legitimate inference from the evidence, and the trial court was afforded wide discretion in regulating his comments. We note, however, that even if these comments were to be viewed as expressions of the prosecutor’s personal opinions and, thus, as ‘crossing the line’ of permissible argument, they, nonetheless, would not constitute reversible error. There is no fixed standard for determining whether a prosecutor’s comments so prejudiced the factfinding process as to require a new trial.”
663 So.2d at 1014. Although it is never proper for a prosecutor to state his or her personal opinion regarding the ultimate issue to be decided by the jury, we cannot say that the prosecutor’s comment in this case so infected the trial with unfairness that Smith was denied due process. See Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
B.
Smith next argues that the prosecutor erred by commenting on facts and evidence that were never introduced at the penalty phase.
“ ‘The test of a prosecutor’s legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument. Kirkland v. State, 340 So.2d 1139 (Ala.Crim.App.), cert. denied, 340 So.2d 1140 (Ala.1976 [1977]). Statements based on facts admissible in evidence are proper. Henley v. State, 361 So.2d 1148 (Ala.Crim.App.), cert. denied, 361 So.2d 1152 (Ala.1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Williams v. State, 377 So.2d 634 (Ala.Crim.App.1979); McQueen v. State, 356 So.2d 407 (Ala.Crim.App.1978).’ ”
Ballard v. State, 767 So.2d 1123, 1135 (Ala.Crim.App.1999), quoting Watson v. State, 398 So.2d 320, 328 (Ala.Crim.App.1980).
1.
First, Smith argues that the prosecutor improperly stated the following during voir dire examination:
“Now, DSM-IV, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition. I’m holding it. Can you see it? Anybody read it? Anybody looked at it, gone to the book store, and whatever? It’s another one of those tough questions, you know. Do you remember I mentioned I wanted to know if you have arty family members, close social friends that has ever gone and seen a doctor in relationship to a psychiatrist, psychologist for treatment for anything.
“This has five thousand alleged disorders, like too much coffee, too much sex, I’m asking. This is what is in here. Does anybody know anything about this? This is, I think, the Fourth Edition. I believe, allegedly, there is a statement you will see from the records that is called the disclaimer. The experts themselves say their opinions can be right or wrong. They are not sure. It’s been changed four or five times. No one has read this or seen this?
“(No response.)”
(R. 105-06; emphasis added.) Smith asserts that there was no evidence introduced that supported the statement. *285 However, there was evidence presented at the penalty phase that Dr. Michael D’Erri-co, a forensic psychologist, originally concluded that Smith was not mentally retarded but later changed his opinion. Furthermore, the question is not whether a prosecutor’s comment was erroneous but whether the comment so infected the trial with unfairness that Smith was denied due process. Darden v. Wainwright, supra. That standard was not satisfied in this case. See Ex parte Walker, 972 So.2d 737 (Ala.2007).
2.
Smith further contends that the prosecutor argued facts not in evidence when he asked questions about Smith’s ability to run a drug enterprise and that there was no evidence indicating that Smith ran a drug enterprise.
However, Smith’s statement was admitted into evidence at the penalty phase. In the statement Smith told police that he went to find one of the victims, Willie Flournoy, because Flournoy owed Smith $1,500 for drugs. The prosecutor’s comments were based on evidence that had been introduced or were a legitimate inference that could have been drawn from the evidence. See Ballard, supra. Thus, there was no error in the prosecutor’s comments.
C.
Smith next argues that the prosecutor improperly commented on his right not to testify when he remarked on Smith’s demeanor during the sentencing hearing. Specifically, he argues that the prosecutor erred in stating that Smith had his head down on the table during some of the witnesses’ testimony and that Smith showed no remorse. Smith asserts that the comments on his demeanor amounted to comments on his failure to testify and were reversible error.
In Wherry v. State, 402 So.2d 1130 (Ala.Crim.App.1981), this Court addressed whether it was proper for a prosecutor to comment on a defendant’s demeanor during trial when the defendant relied on an insanity defense. We stated:
“ ‘The argument “The defendant was sitting around looking at the floor and faking insanity,” is challenged on the ground that it invades the constitutional guarantee against compelling one to be a witness against himself, and the statutory inhibitions against comment on the failure of the defendant to testify.
“‘Whether the defendant was faking insanity was a primary inquiry in the case. If, instead of taking the stand, he was seeking to make evidence for himself by his demeanor before the jury, this was the legitimate subject of comment.
“ ‘The trial court was in [the] position to see whether this line of argument was within the rule that counsel may draw any inference which the facts tend to support. The conduct of the accused during trial is a proper subject of comment.’ ”
402 So.2d at 1133, quoting Brothers v. State, 236 Ala. 448, 451, 183 So. 433, 436 (1938). See also Cartwright v. State, 645 So.2d 326 (Ala.Crim.App.1994); Bailey v. State, 625 So.2d 1182, 1183 (Ala.Crim.App.1993).
Here, Smith relied on a mental-retardation defense. Accordingly, Smith’s actions during trial were the proper subject of comment by the prosecutor. See Wherry, supra.
D.
Smith further argues that the prosecutor erred in making the following *286 comment in his closing argument: “How many more times does he get to beat cases before he kills three more people?” (R. 1262.) Smith cites the case of Ex parte Smith, 581 So.2d 531 (Ala.1991), for the proposition that the comment constituted reversible error.
In Ex parts Smith, the argument that the Alabama Supreme Court held constituted reversible error was the following: “ ‘Now, ladies and gentlemen, if this defendant ever gets loose again, he’s going to do it again. He’s going to kill, and he’s going to kill again. And I would ask you to consider that, because ladies and gentlemen, only you can stop him for sure.’ ” 581 So.2d at 533.
Clearly, the comment in this case did not rise to the level of the comment condemned in Smith and was not a direct comment that Smith would kill again. Second, in Smith the comment was made at the guilt phase of a capital trial, and the court noted that the focus on the guilt phase was not sentencing. Thus, Smith does not warrant reversal in this case. Moreover, we find that the comment did not so affect the trial with unfairness that Smith was denied due process. See Darden v. Wainwright.
E.
Smith next argues that the prosecutor erred in stating during voir dire that the State was relying on the aggravating circumstance of the death of two or more persons by one act or pursuant to one course of conduct even though this aggravating circumstance was not enacted until after the triple homicide had been committed.
During voir dire the prosecutor questioned the prospective jurors about the aggravating circumstances that the State was relying on and said that one aggravating circumstance was that the murders were committing during one act. However, this aggravating circumstance, codified at § 13A-5-49(9), Ala.Code 1975, did not become effective until September 1, 1999 almost three years after the murders were committed in this case.
The record also shows that, at the beginning of the penalty phase, the circuit court instructed the jury regarding the application of the aggravating circumstance contained in § 13A-5-49(9), Ala.Code 1975. However, the court soon realized its mistake and instructed the jury as follows:
“Ladies and gentlemen, I told you three aggravating circumstances that the State is going to rely upon. There will actually be two. I instructed you as to one aggravating circumstance that will deleted for you not to consider. And that would be the defendant intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct. So that particular aggravator will not be an issue in this case. The other two aggra-vators that I described to you will be.”
(R. 309.) At the end of the penalty phase, the court instructed the jury on the application of only two aggravating circumstances and emphasized that the jury could consider only the two aggravating circumstances that were given in its instruction. The court also instructed the jury that statements of counsel were not evidence. If error did occur, it was cured by the court’s instructing the jury not to consider that aggravating circumstance. See Stanton v. State, 648 So.2d 638, 643 (Ala.Crim.App.1994).
F.
Smith next asserts that the prosecutor made several improper appeals during closing argument when he urged the jury “to send a message,” when he compared the victims’ rights to those of the defen *287 dant’s, and when he invited the jurors to put themselves in the place of the victims.
1.
Smith first challenges the following argument:
“Speak loudly and speak truthfully and speak justice in this case, and do what the law and the evidence says. He is not mentally retarded. Come back in here and send a message whether it is in Brentwood, it’s at the Country Club, or at Sturgeon Court human beings are worth something in this community. And you can’t execute and kill three of them and try and try to kill a fourth.
[[Image here]]
(R. 1268.) “ ‘[UJrging the jury to render a verdict in such a manner as to punish the crime, protect the public from similar offenses, and deter others from committing similar offenses is not improper argument.’ Sockwell v. State, 675 So.2d 4, 36 (Ala.Crim.App.1993).” Ex parte Walker, 972 So.2d 737, 747 (Ala.2007).
2.
Next, Smith argues that the prosecutor improperly compared Smith’s rights to those of the victims. Smith does not cite the exact argument he objects to but merely a page number to the record. We assume that Smith is referencing the following argument:
“But there was a problem. When he opened up the door, and he pointed the weapon at Derrick Gross, Gross wasn’t going to go down. He knew what was happening. He told you about the fire and the gunshots. He knew what was happening. Yes, he’s got felony convictions, no doubt about it. Does that give him a right to execute and kill people in this country and this community? None whatsoever. They were human beings. They had the same kind of rights he had. He was judge, jury, and executioner for those human beings. And he slaughtered them. He slaughtered them.”
(R. 1241.) We held in Dobyne v. State, 672 So.2d 1319, 1340 (Ala.Crim.App.1994), that a prosecutor’s argument that the defendant served as a “judge, jury, and executioner” to his victim was not improper.
3.
Smith last asserts that the following argument was improper:
“Now, what was it like when we talk about the worst of the worst and the lives and human beings? What is the difference between life and death? What was it like for Teresa Helms as she laid there, and she gurgled, and she choked to death in her own blood and she was dying? What was she thinking about? Was she thinking about her brother? Was she thinking, ‘oh, I wish I had a doctor?’ What was she thinking about when Jerry Jerome Smith fell over her and stepped on her as they stumbled out and he is fighting and going for the gun. ‘Oh, my God, there is the man who shot me six times. I am still alive. He is going to shoot me some more. He is going to inflict more injuries of death upon me as I run out here defenseless.’ ”
(R. 1261.)
In McNair v. State, 653 So.2d 320 (Ala.Crim.App.1992), this Court considered the propriety of the prosecutor’s comments that the victim also had rights. We stated:
“The prosecutor’s references to the victim’s ‘rights’ are similar to the remarks made by the prosecutor in State v. Marshall, 123 N.J. 1, 586 A.2d 85 (N.J.1991), another capital murder case. In Marshall, the prosecutor argued that the victim ‘ “had a right to live her life in full, to watch her boys continue to grow, *288 to watch them graduate from school, to get married and have families of their own.” ’ 123 N.J. at 163, 586 A.2d at 171. The New Jersey Supreme Court found that these comments were improper, as they were ‘an obvious appeal for sympathy toward the victim.’ Id. Accord Jennings v. State, 453 So.2d 1109, 1113-14 (Fla.1984) (in a capital murder trial, it was improper for the prosecutor to ‘compare [the defendant’s] right to use the telephone to call an attorney during his interrogation and the victim’s right to live’), vacated on other grounds, 470 U.S. 1002, 105 S.Ct. 1351, 84 L.Ed.2d 374 (1985); People v. Henderson, 142 Ill.2d [258] at 322, 154 Ill.Dec. [785] at 815-16, 568 N.E.2d [1234] at 1264-65 (in a capital murder trial, the following comments by the prosecutor were improper: ‘What about [the victim’s] rights? Did [the defendant] ask Kim Boyd prior to taking a knife and plunging it in her head and in her neck, in her butt, in her legs, “Do you want to talk to your mom before I kill you?” ... Did he have the compassion to say, “Do you want to complete high school ... do you want to get married and have children and have a life with a family ...?”’); Bell v. State, 724 S.W.2d 780, 802-03 (Tex.Cr.App.1986) (in a capital murder trial, it was improper for the prosecutor to make the following comments: ‘“we’re dealing here with the deaths of Ferd and Irene Chisum, and there is nobody—there was nobody to protect their Constitutional rights, like Walter Bell [the defendant]”; “[n]obody was there to raise procedure of technicality”; and, “[n]obody—essentially, they could not appeal their death sentence to a higher court” ’), cert. denied, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987).
“The remarks in Marshall, Jennings, Henderson, and Bell were all found not to be so prejudicial as to constitute reversible error. We reach the same conclusion in this case. The prosecutor made numerous references to the victim’s rights and several times implied that her rights were to be weighed against the appellant’s. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict. See Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App.1990), affirmed, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992); Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App.1989), affirmed as to instant issue and remanded on other grounds, 585 So.2d 112 (Ala.1991) (on rehearing), affirmed on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992); Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App.1988).”
653 So.2d at 337-38. The comments in this case did not rise to the level of those comments cited in McNair. Accordingly, we find no reversible error.
G.
Smith next argues that the prosecutor misled the jury on the law and the facts on mental retardation. We have examined the prosecutor’s entire argument and find no indication that any comment so infected the trial with unfairness that Smith was denied due process. See Darden v. Wainwright, supra.
Moreover, in Beckworth v. State, 946 So.2d 490 (Ala.Crim.App.2005), this Court held that an instruction on mental retardation in the penalty phase of a capital-murder trial, even if it was erroneous, did not constitute reversible error. We stated:
“ ‘[N]othing in Atkins v. Virginia, 636 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d *289 335 (2002), or in Ex parte Perkins, 851 So.2d 453 (Ala.2002), requires a jury determination of mental retardation.’ The trial court, acting without the benefit of any guidance from the Alabama Legislature or the appellate courts as to the procedure to be followed in determining whether a capital defendant is mentally retarded, made an earnest attempt to comply with the recent Atkins decision and presented the retardation issue to the jury in the form of a special interrogatory. Because this procedure is not mandatory, it effectively provided Beck-worth with an additional determination on the issue of retardation—a determination he is not currently entitled to receive under Alabama law. Because a jury determination of the issue was not required, any alleged error in the instruction to the jury on the issue would have been harmless. Rule 45, Ala. R.App. P.”
946 So.2d at 510-11. Thus, even if the prosecutor misstated the law on mental retardation, we would find no error based on the reasoning of the court in Beck-worth.
V.
Smith next argues that the circuit court diminished the jury’s function in the penalty phase by stating that its verdict was advisory. He asserts that subsequent to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the jury’s verdict in the penalty phase is no longer merely a recommendation. He asserts that the error was more egregious in this case because there was no aggravating circumstance that was proven by the jury’s verdict in the guilt phase.
We addressed this same issue in Duke v. State, 889 So.2d 1, 43 (Ala.Crim.App.2002), vacated on other grounds, 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005),[11] and stated:
“Duke also argues that Ring [v. Arizona, 536 U.S. 584 (2002),] requires penalty-phase relief when the jury is told that its verdict is ‘advisory or merely a ‘recommendation.’ Contrary to Duke’s contention, Ring does not address the advisory nature of a jury’s sentencing recommendation. Duke’s jury was properly informed that under Alabama law, its verdict was an advisory one. See § 13A-5-46, Ala.Code 1975. Thus, the jury was not misled regarding its role in the sentencing decision. See Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).”
See also Irvin v. State, 940 So.2d 331 (Ala.Crim.App.2005). We likewise find no error in the circuit court’s comments.
Moreover, this was not a case in which the jury had to make a finding of fact on the aggravating circumstance that would make Smith eligible for the death penalty because one of the aggravating circumstances involved a prior conviction. As the Alabama Supreme Court stated in an earlier opinion in this case:
“After the United States Supreme Court issued its holding in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 *290 L.Ed.2d 556 (2002), this Court ordered supplemental briefing to allow the parties to discuss the impact of Ring on Smith’s case. We need not, however, address the implications of the holding in Ring on the Alabama capital-sentencing statutes. Even if Ring draws into question the constitutionality of Alabama’s capital-sentencing scheme, and we are not prepared to say that it does, a Ring violation did not occur in this case.
“In his special writing in Bottoson v. Moore, 833 So.2d 693, 719 (Fla.2002), Justice Pariente eloquently explained:
“‘[T]he presence of a prior violent felony conviction meets the threshold requirement of Apprendi [v. New Jersey, 530 U.S. 466 (2000),] as extended to capital sentencing by Ring [v. Arizona, 536 U.S. 584, 122 S.Ct. 2428 (2002) ]. In Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), the United States Supreme Court approved an enhanced sentence for the crime of returning to the United States after being deported, based on the judge’s finding that the deportation was pursuant to three prior convictions of aggravated felonies. The Court rejected a claim that the enhancement was improper because the indictment had not alleged that the deportation was pursuant to the prior convictions. As explained in Appren-di, “our conclusion in Almendarez-Torres turned heavily upon the fact that the additional sentence to which defendant was subject was ‘the prior commission of a serious crime.’ ” 530 U.S. at 488, 120 S.Ct. 2348. In Apprendi, the Court held:
“ ‘ “[Tjhere is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.”
“ ‘Id. at 496, 120 S.Ct. 2348. Accordingly, the Court held: “Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.” Id. at 490, 120 S.Ct. 2348 (emphasis supplied [in Bottoson ]).
“ ‘In extending Apprendi to capital sentencing, the Court in Ring did not eliminate the “prior conviction” exception arising in Almendarez-Torres. The Court noted in Ring that “[n]o aggravating circumstance related to past convictions in his case; Ring therefore does not challenge Almendarez-Torres.” 536 U.S. at 597 n. 4, 122 S.Ct. at 2437 n. 4.’
“833 So.2d at 722-23 (footnote omitted). As was the circumstance in Bottoson, one of the aggravating circumstances presented by the State in the penalty phase of this trial involved a prior felony conviction; therefore, Smith is not entitled to relief pursuant to Ring. See Almendarez-Torres v. United States, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).”
Ex parte Smith, 213 So.3d at 222-23. For the foregoing reasons we find no error.
VI.
Smith next argues that he was denied his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Consti *291 tution and under the Alabama Constitution because the jury failed to make specific findings of fact concerning the aggravating circumstances that it found to exist. Because Smith did not object as to this issue, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
In Lewis v. State, 24 So.3d 480 (Ala.Crim.App.2006), this Court addressed a similar issue and stated:
“[I]n Ex parte McNabb, 887 So.2d 998 (Ala.2004), the Supreme Court held that even a nonunanimous recommendation of death by the jury proved that the jury, including the jurors who voted against the recommendation of death, had unanimously found the existence of a proffered aggravating circumstance, even though the circumstance was not included within the definition of the particular capital-murder offense charged in the indictment, because the trial court had specifically instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it had already unanimously agreed that the aggravating circumstance existed. Because the jury recommended by a vote of 10-2 that Lewis be sentenced to death, it is clear that it unanimously found the existence of at least one aggravating circumstance.”
Lewis, 24 So.3d at 535-36.w
In this case, the circuit court repeatedly instructed the jury that it could not recommend a sentence of death unless it found that at least one aggravating circumstance existed beyond a reasonable doubt. Thus, based on our holding in Lewis, we find no error in the circuit court’s instructions.
VII.
Smith next argues that the circuit court erred in not conducting a pretrial hearing on the issue whether he is mentally retarded and ineligible for the death penalty.
This issue was addressed by the Alabama Supreme Court in a previous opinion in this case. The Court stated: “We reject Smith’s contention that in light of the holding in Atkins, we must remand this cause for the trial court to conduct a hearing to determine if he is mentally retarded and therefore not subject to the death penalty.” Smith v. State, 213 So.3d at 224. Holding a pretrial hearing would have been contrary to the Supreme Court’s instructions.
Smith further argues that the circuit court erred in refusing to instruct the jury that it could not sentence Smith to death if he was mentally retarded, that the instructions on mental retardation were erroneous, and that the jury should have been given a separate verdict form concerning mental retardation.
In Beckworth v. State, 946 So.2d 490 (Ala.Crim.App.2005), this Court addressed similar claims regarding a mental-retardation instruction and stated:
“[NJothing in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), or in Ex parte Perkins, 851 So.2d 453 (Ala.2002), requires a jury determination of mental retardation. The trial court, acting without the benefit of any guidance from the Alabama Legislature or the appellate courts as to the procedure to be followed in determining whether a capital defendant is mentally retarded, made an earnest attempt to comply with the recent Atkins decision and presented the retardation issue to the jury in the form of a special interrogatory. Because this procedure is not mandatory, it effectively provided Beck-worth with an additional determination on the issue of retardation—a determination he is not currently entitled to receive under Alabama law. Because a *292 jury determination of the issue was not required, any alleged error in the instruction to the jury on the issue would have been harmless. Rule 45, Ala. R.App.P.”
946 So.2d at 510-11. For the reasons stated in Beckworth, we find no reversible error.
VIII.
Smith next argues that the circuit court erred in denying his motion to conduct voir dire on the subject of racial bias. Smith cites Turner v. Murray, 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), for the proposition that he was entitled to have the prospective jurors questioned extensively about any possible racial bias they might have.
The record shows that Smith filed a pretrial motion to “permit extensive voir dire on the issue of racial bias.” (C.R. 428.) However, the record also shows that no ruling was made on this motion.[12] Also, at a pretrial-motion hearing at which numerous motions were discussed and disposed of, Smith failed to bring this motion to the court’s attention.
There is no indication that the circuit court limited the voir dire as to possible racial bias. Indeed, there is no indication that Smith attempted to question the prospective jurors about racial bias. “‘[T]he trial court has discretion regarding how the voir dire examination of [the] jury will be conducted, and ... reversal can be predicated only upon an abuse of that discretion.’ ” Harris v. State, 632 So.2d 503, 518 (Ala.Crim.App.1992).
Furthermore, the United States Supreme Court in Turner v. Murray, stated:
“We hold that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue or racial bias. The rule we propose is minimally intrusive; as in other cases involving 'special circumstances,’ the trial judge retains discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively.”
476 U.S. at 36-37. In this case, Smith and the three victims were all African-Americans. Thus, Turner v. Murray has no application to this case. For the foregoing reasons we find no error.
IX.
Smith next argues that the death penalty was imposed in a racially biased manner in violation of state and federal law. He argues in brief: “[T]here is a pattern of racially discriminatory imposition of the death penalty in the Twentieth Judicial Circuit. At the time of Mr. Smith’s sentencing, twenty-three people had been sentenced to death in the Twentieth Judicial Circuit since the resumption of capital punishment.” (Smith’s brief at pp. 61-62.) This argument consists of three sentences in Smith’s brief to this Court.[13]
We have thoroughly reviewed the record and find no indication that the sentence imposed on Smith was the result of racial *293 bias. There is no support for this assertion in the record.
X.
Smith next argues that the State failed to provide him with adequate notice of the aggravating circumstances that it was relying on for imposition of the death penalty. He asserts that after Ring v. Arizona he is entitled to advance notice of the aggravating circumstances.
Contrary to Smith’s assertion, this Court has continued to hold subsequent to Ring that “ ‘ “a defendant has no right to advance notice of the state’s intention to rely on any of the aggravating circumstances.” ’ Irvin v. State, 940 So.2d 331, 364 (Ala.Crim.App.2005), quoting Bush v. State, 695 So.2d 70, 87 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997), and cases cited therein.” Beckworth v. State, 946 So.2d 490, 513 (Ala.Crim.App.2005).
Moreover, in this case, the aggravating circumstances that the State relied on to invoke the death penalty were also presented at Smith’s first sentencing hearing. Smith had notice of these aggravating circumstances.
XI.
Smith next argues that the circuit court erred in charging the jury on the aggravating circumstance enumerated in § 13A-5-49(3), Ala. Code 1975—that Smith “knowingly created a great risk of death to many persons.” He asserts that the court’s instructions on this circumstance and the circumstance itself is unconstitutionally broad and vague as applied in this case.
In our original opinion on this case, we stated:
“[Smith] contends that the trial court erroneously charged the jury on, and subsequently found the existence of, the aggravating circumstance that he knowingly created a great risk of death to many persons, § 13A-5-49(3), He argues that this aggravating circumstance ‘contemplates actions in which lives are threatened other than those that form the basis of the capital offense’ ([Smith’s] brief, p. 38) and that its application to these facts is unconstitutionally overbroad and vague.
“The attorney general requests that we hold in abeyance our review of the trial court’s finding of this circumstance until the trial court submits an amended sentencing order. He admits that the trial court’s explanation of its finding of this circumstance is subject to the interpretation that its finding was based solely on the jury’s verdict of guilty, which, the attorney general agrees, would have been improper. Thus, at this time, we address only [Smith’s] contention that this aggravating circumstance should not have been submitted to the jury for its consideration. We review this contention for plain error, because [Smith] made no objection to the jury’s consideration of this aggravating circumstance. In fact, defense counsel, in his opening remarks in the sentencing phase, stated that the defense assumed that it was true that [Smith] ‘created a great risk of deadly harm to many people’ (R. 1972) and, in his closing, again admitted that ‘[you] pose the weight of injuring a lot of people ... [a]nytime you go into some place with a gun and start shooting around’ (R. 2076).
“We find that this aggravating circumstance was properly submitted to the jury. Alabama courts have approved of including the capital murder victims and intended, but surviving, victims in determining whether the facts support the finding of the aggravating circumstance of § 13A-5-49(3). See Ex parte Giles, *294 632 So.2d 577, 583 (Ala.1993) (‘It would be anomalous to hold that [§ 13A-5-49(3) ] allows sentence enhancement where the defendant unintentionally endangers persons other than the homicide victims, but disallows enhancement where the defendant intentionally threatens the lives of others.’) (emphasis in original); Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999) (Part XV, infra). Thus, the prosecution presented some evidence that [Smith] knowingly created a great risk of death to at least six people: in addition to the three victims killed, [Smith] attempted to kill Gross; he put his girlfriend’s life in danger as he struggled with Gross over a gun and attempted to obtain a knife from her, this struggle occurring in a backyard in a residential area; he discontinued his deadly rampage only when the driver of a car pulled up to the residence; and this crime occurred in a ‘crack house,’ which was visited frequently.
“Thus, § 13A-5-49(3) was not vague and overbroad as applied to the facts of this case. See Wilson v. State, 111 So.2d at 922 (application not arbitrary or inconsistent with prior law where the appellant’s conduct created a risk to seven people who were in one room and for one other person who was in another part of the residence); Wesley v. State, 575 So.2d 108, 121 (Ala.Crim.App.1989) (agreement with the trial court’s finding that ‘ “[t]he number of victims who were murdered, shot, and shot at by the defendant—seven—is undeniable proof that the defendant created a great risk of death to many persons’”), rev’d on other grounds, 575 So.2d 127 (Ala.1990). See also Wilson v. State, 777 So.2d at 922 (§ 13A-5-49(3) is not vague); Giles v. State, 632 So.2d 568, 573 (Ala.Crim.App.1992) (the evidence of the appellant’s attack on six members of a family in the family’s residence clearly established the existence of § 13A-5-49(3)), aff'd, 632 So.2d 577, 583 (Ala.1993).”
Smith, 213 So.3d at 154-55.
The circuit court correctly charged the jury on this aggravating circumstance and correctly applied it to the facts of this case.
XII.
Smith further argues that the circuit court erred in refusing to strike for cause prospective juror T.T. Specifically, he argues that this juror should have been removed because of his views on capital punishment.
Initially, we note that Smith used a peremptory strike to remove this juror and that T.T. did not serve on Smith’s jury. We have returned to the harmless-error analysis when reviewing a circuit court’s ruling refusing to remove a prospective juror for cause. See Bethea v. Springhill Mem’l Hosp., 833 So.2d 1 (Ala.2002); Calhoun v. State, 932 So.2d 923 (Ala.Crim.App.2005). Thus, if error did occur, it was harmless.
Moreover, the following occurred during the voir dire examination of prospective juror T.T.:
“[Defense counsel]: Also, you checked that death is the only appropriate punishment in Number 44. Is it your opinion that if someone kills someone else, that the only sentence he should get would be a death sentence?
“[T.T.]: I would believe that.
“[Prosecutor]: The law is in the penalty phase the State has the burden to prove an aggravating circumstance exists. Are you telling Judge Little—the law also is if the defendant puts up mitigating circumstances, or if they chose not to, the jury can consider those mitigat *295 ing circumstances. Are you telling Judge Little you couldn’t even consider mitigating? In other words, you’d automatically vote death, or you could consider any mitigating circumstance—
“[T.T.]: I would consider it. I’d like to hear the whole thing.
“[Prosecutor]: You don’t have a fixed opinion, I am asking in response to your question that you would automatically vote for death, you wouldn’t do that now?
“[T.T.]: I automatically believe right up front. But I am willing to hear the whole thing to the end before I make a final decision.
“[Prosecutor]: As you sit here today, let me ask you this way, the presumption that the defendant has under the law that he is innocent in reference to the penalty phase, that is the law?
“[T.T.]: Oh, yeah. Yeah, I believe in that.
“[Prosecutor]: My question is, the burden is on the State. You believe that; correct?
“[T.T.]: Yeah.
“[Prosecutor]: If we don’t prove aggravating circumstance, or if we don’t prove it outweighs the mitigating, then, you could come back in and tell Judge Little your decision was life without parole; correct?
“[T.T.]: Yeah, I agree with that.”
(R. 243-45.) T.T. indicated that he would not automatically vote for death in every case but would consider the evidence. “[J]urors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the court.” Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App.2000). Accordingly, there was no reversible error in the circuit court’s failure to remove T.T. for cause.
XIII.
Smith next argues that the circuit court erred in refusing to instruct the jury on several relevant points of law. “It has long been the law in Alabama that a trial court has broad discretion in formulating jury instructions, provided those instructions are accurate reflections of the law and facts of the case.” Culpepper v. State, 827 So.2d 883, 885 (Ala.Crim.App.2001). “When reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999).” Johnson v. State, 820 So.2d at 874. “When requested charges are either fairly and substantially covered by the trial judge’s oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judges may properly refuse to give such charges.” Ward v. State, 610 So.2d 1190, 1194 (Ala.Crim.App.1992).
A.
Smith first argues that the circuit court erred in refusing to give a residual-doubt instruction. He cites Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), in support of his argument that a residual-doubt instruction is warranted when the defendant presents evidence at the penalty phase that relates to his or her degree of culpability in the capital offense.
The record shows that Smith requested that the circuit court instruct the jury on “residual or lingering doubt,” that the prosecutor objected, and that the court refused to give this instruction. (C.R. 582; R. 1223-34.) However, after the circuit court gave the instructions, Smith’s coun *296 sel merely stated: “[W]e would object to the Court not giving the prior requested charges that we have already stated them one time.” (R. 1295.) Such an objection is not sufficient to preserve the issue for appellate review. See Greenhill v. State, 746 So.2d 1064 (Ala.Crim.App.1999). Thus, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
Residual doubt is not a mitigating circumstance; thus, there is no right to a residual-doubt instruction in the penalty phase of a capital-murder trial. See Sharifi v. State, 993 So.2d 907 (Ala.Crim.App.2008); Melson v. State, 775 So.2d 857 (Ala.Crim.App.1999); Myers v. State, 699 So.2d 1281 (Ala.Crim.App.1996); and Harris v. State, 632 So.2d 503 (Ala.Crim.App.1992).
Moreover, in Franklin v. Lynaugh, the United States Supreme Court stated:
“Our edict that, in a capital case, ‘ “the sentencer ... [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense,” ’ Eddings v. Oklahoma, 455 U.S. 104, 110 (1982) (quoting Lockett [v. Ohio], 438 U.S. [586], at 604 [ (1978) ]) in no way mandates reconsideration by capital juries, in the sentencing phase, of their ‘residual doubts’ over a defendant’s guilt. Such lingering doubts are not over any aspect of petitioner’s ‘character,’ ‘record,’ or a ‘circumstance of the offense.’ This Court’s prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor.”
487 U.S. at 174. Franklin does not stand for the proposition cited by Smith.
B.
Smith next argues that the circuit court erred in not instructing the jury on the role of sympathy and mercy in its deliberations. He asserts that he was entitled to have the jury instructed that mercy and sympathy may be based on the mitigating evidence presented at trial.
The record shows that Smith requested that the court instruct the jury as follows:
“Your exercise of sentencing discretion may be influenced by a sympathetic response to mitigating evidence. You may consider mitigating evidence related to Jerry Jerome Smith’s character and background, whether or not related to the offense for which he is on trial precisely because that evidence may arouse sympathy or compassion for the defendant.”
(C.R. 592.) The circuit court refused to give this instruction. However, after the instructions were given, Smith merely stated that the court had erred in failing to give his requested instructions. As we previously stated, this objection is not sufficient. See Greenhill v. State, 746 So.2d 1064 (Ala.Crim.App.1999). Thus, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
The circuit court committed no error in refusing to give an instruction on sympathy. Conversely, this Court has held that an instruction that precludes any consideration of sympathy in the penalty phase of a capital trial is proper. See Carroll v. State, 599 So.2d 1253, 1271 (Ala.Crim.App.1992).
The circuit court gave the following instruction:
“And in reaching your finding concerning the aggravating and mitigating circumstances in this case and in determining what to recommend and what the punishment should be in this case, *297 you must avoid any influence of passion, prejudice, or any arbitrary factor.”
(R. 1281.) Similar instructions have been upheld by the United States Supreme Court. See California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).
Second, Smith requested that the circuit court give the following instruction:
“At the penalty phase, you may consider sympathy, pity, compassion, or mercy for Jerry Jerome Smith that has been raised by any evidence that you have heard or seen. You are not to be governed by conjecture, prejudice, public opinion, or public feeling. You may decide that the sentence of life imprisonment is appropriate for Jerry Jerome Smith based on the sympathy, pity, compassion, and mercy you feel as a result of the evidence introduced at the penalty phase.”
(C.R. 592.) A capital defendant is not entitled to a mercy instruction in the penalty phase. See Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005); Melson v. State, 775 So.2d 857 (Ala.Crim.App.1999). Therefore, the circuit court committed no error in failing to give a mercy instruction.
C.
Next, Smith argues that the circuit court erred in not instructing the jury that it was required to unanimously agree that the same aggravating circumstance existed in order to consider that aggravating circumstance.
Smith did not object to the circuit court’s failure to give this instruction; therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
The circuit court gave the following instruction, in pertinent part:
“The burden of proof again is on the State of Alabama to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance or circumstances considered by you in determining what the punishment is to be recommended in this case. This means that before you can even consider recommending that the defendant’s punishment be death, each and every one of you must be convinced beyond a reasonable doubt based on the evidence that, at least, one or more of the aggravating circumstances exist.”
(R. 1275.)
The Alabama Supreme Court in Ex parte McNabb, 887 So.2d 998 (Ala.2004), held that a trial court did not commit plain error in failing to instruct the jury that it must agree on the same aggravating circumstance. The Supreme Court stated:
“McNabb concedes that the jury was instructed to make a unanimous finding as to whether any of the three aggravating circumstances ultimately found to exist by the trial judge existed. He insists, however, that the trial court committed plain error in failing to instruct the jury expressly that it must unanimously find the existence of the same aggravating circumstance. This failure, he contends, created the danger that less than all of the jurors found the existence of any one aggravating circumstance. If that occurred, he argues, then his death sentence is based on factors never found by the jury, and violates the rule set forth in Ring [v. Arizona, 536 U.S. 584 (2002) ]. We find no merit in this argument. The instructions contained a number of premises that, when considered as a whole, apprised the jury of the proper unanimity requirement.”
887 So.2d at 1005. Here, the instructions were similar to those given in McNabb and did not constitute error.
*298 D.
Smith next asserts that the circuit court erred in failing to instruct the jury to return a recommendation of life imprisonment without the possibility of parole if the aggravating circumstances did not outweigh the mitigating circumstances. He cites the Supreme Court’s opinion in Ex parte Bryant, 951 So.2d 724 (Ala.2002), in support of this argument.
Smith did not object to the circuit court’s failure to give this instruction; therefore, we are limited to determining whether there was plain error. See Rule 45A, Ala.R.App.P.
The Alabama Supreme Court in finding plain error in the jury instructions in Bryant stated:
“In the case now before us, the jury instructions erroneously allow the conclusion that the death penalty is appropriate even if the aggravating circumstances do not outweigh the mitigating circumstances so long as the mitigating circumstances do not outweigh the aggravating circumstances. The trial judge in this case did not add the caveat which sufficed in [Ex parte] Trawick, [698 So.2d 162 (Ala.1997) ], that the jury was to ‘recommend the death penalty only if [the jury] found that the aggravating circumstances outweighed the mitigating circumstances.’ Trawick, 698 So.2d at 173. Indeed, at the end of the instructions on this topic, the trial judge implicitly told the jury that it might recommend death even if the jury did not find an aggravating circumstance at all: ‘if you do not find that an alleged aggravating circumstance was proved, that does not automatically or necessarily mean that you should sentence Mr. Bryant to death ....’ (R. 1103, quoted supra.) (Emphasis added.)”
951 So.2d at 730.
In this case the circuit court gave jury instructions at both the beginning and the end of the penalty phase. It is clear that the jury knew that it could only recommend a death sentence if the aggravating circumstances outweighed the mitigating circumstances. The charges were substantially similar to charges the Supreme Court upheld in Ex parte McNabb, supra. In McNabb the Supreme Court stated:
“The charge in this case was not infected with the peculiar error present in [Ex parte ] Bryant, [951 So.2d 724 (Ala.2002),] that is, the jury in this case was not invited to recommend a sentence of death without finding any aggravating circumstance. It was that invitation in Bryant that caused the error in that case to rise to the level of plain error, rather than error reversible only by a proper objection. Thus, in this case, although the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error ‘seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,’ Ex parte Davis, 718 So.2d [1166] at 1173-74 [ (Ala.1998) ], so as to require a reversal of the sentence.”
887 So.2d at 1004. Accordingly, we find no plain error in the court’s jury instructions on weighing the aggravating and the mitigating circumstances. See McNabb.
E.
Smith next argues that the circuit court’s instructions on mitigating circumstances were confusing, erroneous, and shifted the burden of proof to him. Smith made no objection to the court’s charge on this issue, thus we review this claim for plain error. See Rule 45A, Ala.R.App.P.
Smith specifically challenges the following instruction:
*299 “A mitigating circumstance considered by you should be based only on the evidence you heard. When a factual existence of any offered mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence. The burden of disproving it by a preponderance of the evidence means that you are to consider that the mitigating circumstance does not exist unless taking the evidence as a whole it is more likely than not that the mitigating circumstance does exist.”
(R. 1280) (emphasis added). Clearly the circuit court misspoke in the isolated portion of its detailed instructions that is emphasized above.
However, we have reviewed the entire jury instructions, and we find that the circuit court thoroughly instructed the jury that the State had the sole burden of proving the aggravating circumstances. The instructions left it abundantly clear that Smith had no burden of proof. “ ‘The giving of an erroneous instruction is not ground for reversal where it could not in any manner have prejudiced the accused. Dennis v. State, 118 Ala. 72, 28 So. 1002 (1898).’ ” Hill v. State, 721 So.2d 249, 253 (Ala.Crim.App.1998). There is no indication that Smith was prejudiced by the misstatement.
XIV.
Smith next argues that the circuit court erred in allowing the introduction of irrelevant and inflammatory evidence. Specifically, he asserts that the autopsy photographs and testimony from family members about the victims were inadmissible and only resulted in prejudice to him.
The autopsy photographs were relevant to the aggravating circumstance that Smith “knowingly created a grave risk of death to many persons.” Thus, the photographs were properly admitted into evidence. See Key v. State, 891 So.2d 353, 373 (Ala.Crim.App.2002).
Also, victim-impact evidence is admissible at the penalty phase of a capital-murder trial. In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court stated:
“[A] State may properly conclude that for the jury to assess meaningfully the defendant’s moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. ‘[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.’ Booth [v. Maryland ], 482 U.S. [ (1987) ] (White, J., dissenting) (citation omitted). By turning the victim into a ‘faceless stranger at the penalty phase of a capital trial,’ [South Carolina v.] Gathers, 490 U.S. [ (1989) ] (O’Connor, J., dissenting), Booth deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.”
501 U.S. at 825.
XV.
Smith next argues that evolving standards of decency have rendered Alabama’s method of execution unconstitutional. Alabama’s primary method of execu *300 tion is lethal injection. See § 15-18-82.1(a), Ala.Code 1975.
In Ex ‘parte Belisle, 11 So.3d 323 (Ala.2008), the Alabama Supreme Court stated:
“The Eighth Amendment to the United States Constitution provides: ‘Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.’ ‘Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there something inhuman and barbarous,—something more than the mere extinguishment of life.’ In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). However, as the Supreme Court of the United States recently stated in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008):
“ ‘Our cases recognize that subjecting individuals to a risk of future harm— not simply actually inflicting pain— can qualify as cruel and unusual punishment. To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must be “sure or very likely to cause serious illness and needless suffering,” and give rise to “sufficiently imminent dangers.” Helling v. McKinney, 509 U.S. 25, 33, 34-35[, 113 S.Ct. 2475, 125 L.Ed.2d 22] (1993) (emphasis added). We have explained that to prevail on such a claim there must be a “substantial risk of serious harm,” an “objectively intolerable risk of harm” that prevents prison officials from pleading that they were “subjectively blameless for purposes of the Eighth Amendment.” Farmer v. Brennan, 511 U.S. 825, 842, 846, and n. 9[, 114 S.Ct. 1970, 128 L.Ed.2d 811] (1994).’
“553 U.S. at 48-51, 128 S.Ct. at 1530-31.
“In Baze, two death-row inmates challenged Kentucky’s use of the three-drug protocol, arguing ‘that there is a significant risk that the procedures will not be properly followed—in particular, that the sodium thiopental will not be properly administered to achieve its intended effect—resulting in severe pain when the other chemicals are administered.’ 553 U.S. at 49, 128 S.Ct. at 1530. Beli-sle’s claim, like the claims made by the inmates in Baze, ‘hinges on the improper administration of the first drug, sodium thiopental.’ Baze, 553 U.S. at 53, 128 S.Ct. at 1533.
“The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze, 553 U.S. at 46, 128 S.Ct. at 1538, and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, 553 U.S. at 61, 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.’ Baze, 553 U.S. at 43, 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance—missing from Kentucky’s protocol—that the first drug had been properly administered.’ Baze, 553 U.S. at 47, 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting *301 the mere possibility that something may go wrong. ‘Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusual.’ Baze, 553 U.S. at 50, 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.”
11 So.3d at 338-339. Also, as this Court stated in Saunders v. State, 10 So.3d 53, 112 (Ala.Crim.App.2007):
“Moreover, we note that although § 15-18-82.1(a), Ala.Code 1975, provides that the primary method of execution in Alabama is lethal injection, unless the person sentenced to death elects to be executed by electrocution, the statute also provides that if lethal injection is held unconstitutional by the United States Supreme Court or by the Alabama Supreme Court, ‘all persons sentenced to death for a capital crime shall be executed by any constitutional method of execution.’ § 15-18-82.1(c), Ala. Code 1975. See also § 15-18-82.1(h), Ala.Code 1975 (‘In any case in which an execution method is declared unconstitutional, the death sentence shall remain in force until the sentence can be lawfully executed by any valid method of execution.’). Therefore, even if Alabama’s lethal-injection protocol were found to be unconstitutional, Saunders would not be entitled to a reversal of his death sentence.”
Alabama’s method of execution by means of lethal injection—a three-drug protocol—does not constitute cruel and unusual punishment.
XVI.
In Smith’s last section of his brief to this Court he cites six reasons why he was denied a fair trial. The reasons each consist of one or two sentences.[14]
A.
Smith first argues that the circuit court erred in denying his ex parte motion for funds for an investigator and a jury-selection assistant. His entire argument consists of the following: “Were it not for Mr. Smith’s poverty, such an expert would undoubtedly have been retained. See Ex parte Dubose, 662 So.2d 1189 (Ala.1995).” (Smith’s brief at pp. 78-79.)
“[A] defendant, in order to be entitled to funds to pay for an expert, must show more than a mere possibility that he or she will receive useful assistance from the expert. Rather, the defendant must show a reasonable probability that the expert would aid in the defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial. In the past, Alabama decisions have been based upon whether the defendant made an adequate showing of a need for the requested expert. Dubose [v. State ], 662 So.2d [1189] at 1191 [ (Ala.1995) ]; see also, Smith v. State, 623 So.2d 369 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993); McLeod v. State, 581 So.2d 1144 (Ala.Cr.App.1990); Siebert v. State, 562 So.2d 586 (Ala.Cr.App.1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990); Stewart v. State, *302 562 So.2d 1365 (Ala.Cr.App.1989); McGahee v. State, 554 So.2d 454 (Ala.Cr.App.), aff'd, 554 So.2d 473 (Ala.1989).”
Ex parte Dobyne, 672 So.2d 1354, 1357 (Ala.1995). There is no indication that Smith satisfied this standard. Accordingly, we find no error.
B.
Smith next argues that the circuit court erred in allowing the State to play a videotape of the crime scene. The circuit court committed no error in allowing the videotape of the crime scene to be introduced at the penalty phase. See Key v. State, 891 So.2d 353 (Ala.Crim.App.2002). Also, § 13A-5-45(c), Ala.Code 1975, states:
“At the sentencing hearing evidence may be presented as to any matter that the court deems relevant to the aggravating and mitigating circumstances referred to in Sections 13A-5-49, 13A-5-51 and 13A-5-52. Evidence presented at the trial of the case may be considered insofar as it is relevant to the aggravating and mitigating circumstances without the necessity of re-introducing that evidence at the sentence hearing, unless the sentence hearing is conducted before a jury other than the one before which the defendant was tried.”
See also England v. State, 940 So.2d 389, 399-400 (Fla.2006) (photographs of decomposed victim were admissible at penalty phase because they were relevant to aggravating circumstance).
C.
Smith next argues that the circuit court erred in not allowing him to properly impeach State’s witness Kevin Bridges. Bridges testified that when he was in the Houston County jail on charges of sexual abuse in the first degree, Smith was incarcerated with him. He said that he heard Smith say that “he was going to get off on a mental plea” and that he had shot three people. (R. 473.) Bridges also said that, based on his observation of Smith for over one year while they were in the jail together, he did not believe that Smith was mentally retarded. Bridges admitted that he had pleaded guilty to sexual abuse in the first degree and that he had been sentenced to three years in prison.
On cross-examination Bridges was asked if he had “gotten a couple of breaks in the past in Florida.” The prosecutor objected and argued that the information that the defense sought to solicit was based on nolo contendré pleas and was not admissible. The circuit court agreed and did not allow Smith to introduce the nolo contendré pleas. “Present law ... is that ‘a conviction on a plea of nolo contendere is not admissible in this jurisdiction for the purpose of discrediting a witness.’ Wright v. State, 38 Ala.App. 64, 68, 79 So.2d 66, 69 [(1954)], cert. denied, 262 Ala. 420, 79 So.2d 74 (195[5]).” Singleton v. State, 622 So.2d 934, 935 (Ala.Crim.App.1992).
Moreover, the circuit court gave Smith wide latitude in attempting to impeach Bridges. There was no violation of Smith’s right to cross-examine Bridges.
D.
Smith next argues that the circuit court erred in allowing the medical examiner to testify about the victims’ causes of death. The medical examiner’s testimony was properly admissible at the penalty phase because it was relevant to prove the aggravating circumstance that Smith created a great risk of death to others. See § 13A-5-45(d), Ala.Code 1975.
E.
Smith argues that the circuit court erred in not allowing him to conduct a redirect examination of Dr. Andrew Morton. Dr. Morton, a pharmacist and profes *303 sor of pharmacology, was called to testify about the affects of cocaine addiction. Dr. Morton also testified that he believed that, based on his examination of all of the evidence, cocaine was a factor in the triple homicide.
The record shows that, after the prosecutor cross-examined Dr. Morton, Smith asked to conduct a redirect of the witness. The circuit court said that he would not allow the redirect unless Smith was going to present new evidence. (R. 1044.) However, Smith did not inform the court about what he intended to elicit from this witness. Smith made no offer of proof. See Myers v. State, 601 So.2d 1150 (Ala.Crim.App.1992). Thus, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
“A party who calls a witness is generally required to elicit on direct examination all that the party wishes to prove by that particular witness. When the calling party has that witness on redirect examination, the object is to answer any matters brought out on the cross-examination of the witness by the adversary.”
Charles Gamble, McElroy’s Alabama Evidence § 439.01(1) (5th ed. 1996).
The direct examination of Dr. Morton shows that the court allowed Smith great leeway in questioning this witness. Moreover, we do not know what Smith sought to elicit from this witness on redirect examination. Accordingly, we find no reversible error.
F.
Sixth, Smith argues that the “trial court erred in refusing to permit defense counsel to introduce certified records of convictions of State witness Derrick Gross, the Department of Corrections’ file of State witness Kevin Bridges, and the case file of Mr. Smith’s co-defendant, Lekina Smith, showing that Ms. Smith reached a plea agreement pursuant to which the charge of capital murder was reduced to hindering prosecution.” (Smith’s brief at p. 80.)
When Smith sought to admit the certified copies of Gross’s prior convictions, the State objected and argued that the copies should not be admitted because they showed specific facts about his convictions.
“ ‘Although a witness may be impeached by showing that he has been convicted of a crime involving moral turpitude, Ala.Code § 12-21-162 (1975); generally, only the name of the crime, the time and place of conviction, and the punishment imposed are proper inquiries. Favor v. State, 389 So.2d 556 (Ala.Cr.App.1980); Conley v. State, 354 So.2d 1172 (Ala.Cr.App.1977); C. Gamble McElroy’s Alabama Evidence § 145.01(11) (3d ed. 1977).’ ”
Scarbrough v. State, 528 So.2d 890, 893 (Ala.Crim.App.1988), quoting Wynn v. State, 423 So.2d 294, 301 (Ala.Crim.App.1982). See Rule 608(b), Ala.R.Evid. The circuit court also properly declined to admit Kevin Bridges’s Department of Corrections’ file for this same reason.
When Smith attempted to introduce Lekina Smith’s entire case file, the following occurred:
“[Prosecutor]: The law in Alabama says what happened to one codefendant is not relevant to the other, unless—and she hasn’t testified for the State. Put the conviction in. They should get that in, but not the whole social history.
“The Court: Okay. I’ll let the conviction in, but the rest of the file is denied.”
(R. 1118.)[15] We cannot say that the circuit court erred in not admitting the entire case file of Smith’s codefendant.
*304 XVII.
Last, as required by § 13A-5-53, Ala.Code 1975, we must address the propriety of Smith’s sentence of death. Smith was convicted of the capital offense of murdering two or more people by one act or pursuant to one scheme or course of conduct. See § 13A-5-40(10), Ala.Code 1975. The record shows that Smith’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala. Code 1975.
The circuit court found as aggravating circumstances that Smith knowingly created a great risk of death to many persons and had previously been convicted of “another felony involving the use or threat of violence to the person.” See § 13A-6-49(2) and (3), Ala.Code 1975. The court stated the following concerning the statutory mitigating circumstances:
“The evidence presented by the defense basically showed matters that had happened to [Smith] and [Smith’s] family members that could possibility affect his dysfunction as an adult. The following evidence was presented during the sentencing on this mitigating circumstance:
“(1) That [Smith’s] mother and father were alcoholics and that one or more of his family members abused drugs and alcohol.
“(2) That [Smith] had no relationship with his father who was an alcoholic and usually unemployed and in jail.
“(3) That [Smith’s] home environment was not healthy. His grandmother raised him because of his parent’s alcohol problems. [Smith] was sexually abused and molested by an older cousin when he was twelve years of age. That [Smith’s] older brother was also molested. That [Smith’s] sister became pregnant at the age of thirteen. [Smith] witnessed physical altercations between his parents. [Smith] and his siblings started abusing drugs and alcohol when he was eight years old. At the age of eighteen, [Smith] lived with his sister who was abusing drugs and alcohol.
“(4) The evidence shows that [Smith] had a brother with a serious mental illness and a sister who was mentally retarded. [Smith’s] older brother was also mentally retarded and took psycho tropic medication and had been diagnosed as a schizophrenic. Both siblings had been incarcerated.
“Other evidence provided on this issue were the following:
“(1) [Smith’s] use or misuse or abuse of drugs was a result of his mental or emotional disturbance.
“(2) Mr. Smith could never develop a father-son relationship with his natural father.
“(3) Jerry Jerome Smith generally has a pleasant disposition.
“(4) Jerry Jerome Smith is borderline mentally retarded.
“(5) Jerry Jerome Smith has the learning capacity of a third grader.
“(6) Jerry Jerome Smith was on drugs and alcohol when this crime was committed.
“(7) Jerry Jerome Smith acted under duress when this crime was committed inasmuch as he believed his mother would be injured or killed.
“(8) First consumed alcohol at the age of eight.
“(9) Was sniffing gas and lacquer thinner at the age of nine or ten.
“(10) At the age of ten or eleven, Mr. Smith was sexually abused by his cousin.
*305 “(11) Mr. Smith was in special education classes all of his life; only finished the eighth grade.
“(12) Has a history of excessive alcohol and drug abuse. Mr. Smith has sniffed gas, lacquer thinner, and used marijuana, heroine, angel dust, acid (LSD), cocaine, valium, quaaludes, crack, rush, hash, alcohol, home brew and wine.
“(13) Mr. Smith cannot read or write.
“(14) [Smith’s] low IQ and his low frustration tolerance and poor impulse control.
“(15) The dysfunction of his childhood home.
“(16) The fact that he acted as a 12 year old with regard to the capacity to form the intent to commit the crime.
“The Court has considered all of the factors listed above on whether there existed the statutory mitigating circumstance under § 13A-5-51(6). The Court finds that it does exist. However, the Court finds that this evidence did not mitigate [Smith’s] crime or punishment.
“The Court also considered all of the above evidence in the light of non-statutory mitigating circumstances under § 13A-5-52 and finds that the evidence presented does not mitigate [Smith’s] crime or punishment.”
(C.R. 603-06.) The circuit court found the following concerning the nonstatutory mitigating circumstances:
“(1) Mr. Smith could never develop a father-son relationship with his natural father.
“(2) Mr. Smith did not resist arrest.
“(3) In prison, Mr. Smith is capable of helping other inmates and contributing to society.
“(4) Jerry Jerome Smith has a pleasant disposition.
“(5) Jerry Jerome Smith is mildly mentally retarded.
“(6) Jerry Jerome Smith has the learning capacity of a third grader.
“(7) Jerry Jerome Smith was on drugs and alcohol when this crime was committed.
“(8) Jerry Jerome Smith acted under duress when this crime was committed inasmuch as he believed his mother would be injured or killed.
“(9) His mother was an alcoholic.
“(10) Darren Smith (brother) is mentally retarded; he has been in jail for shoplifting.
“(11) Jerry Jerome Smith first consumed alcohol at the age of eight (8).
“(12) Jerry Jerome Smith was sniffing gas and lacquer thinner at age nine (9) or ten (10).
“(13) Jerry Jerome Smith, at age ten (10) or eleven (11), was sexually abused by his cousin.
“(14) Mother and father and all siblings had a criminal history.
“(15) At the age of twelve (12), Jerry Jerome Smith, Darren, Mary, and Willie [Smith’s siblings] were at home. Eddie Lee Mills came in and raped Mary, hit Willie in the head with a frying pan. Jerry Jerome Smith was traumatized about the incident as he was unable to come to the assistance of his sister. He experienced feelings of helplessness in time of crisis.
“(16) Jerry Jerome Smith was in special education classes all of his life and only finished the eighth grade. Even so, he was illiterate when he finished school.
“(17) Jerry Jerome Smith has history of excessive alcohol and drug abuse. Mr. Smith has sniffed gas, lacquer thinner, and used marijuana, heroin, angel dust, acid (LSD), cocaine, valium, quaa-ludes, crack, rush, hash, alcohol, home brew, and wine.
*306 “(18) Jerry Jerome Smith cannot read or write.
“(19) Jerry Jerome Smith’s brother, Arlester, is mentally retarded.
“(20) Jerry Jerome Smith’s sister, Mary, attempted to commit suicide. She has since died of AIDS.
“(21) Jerry Jerome Smith’s sister, Deborah, has an alcohol problem and has attempted suicide.
“(22) Jerry Jerome Smith’s cousin, Annie Jewel Turner, is in a mental institution.”
(C.R. 607-09.)
We agree with the circuit court’s findings. As required by § 13A-5-53(b)(2), Ala.Code 1975, we have independently weighed the aggravating and the mitigating circumstances to determine the propriety of Smith’s sentence of death. After an independent weighing, we are convinced that death was the appropriate sentence for Smith’s brutal killing of Willie Flour-noy, Theresa Helms, and David Bennett.
Smith’s sentence was not disproportionate to the sentences imposed in similar cases. Smith viciously murdered three people during one act or course of conduct because, as he testified in the guilt phase, he was under stress for money that he owed his drug supplier and one victim had called his girlfriend a whore and a slut. Smith’s sentence is not disproportionate to the sentences imposed for other multiple homicides. See Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996); Holladay v. State, 549 So.2d 122 (Ala.Crim.App.1988).
Last, we have searched the penalty phase for any error that may have adversely affected Smith’s substantial rights and have found none. See Rule 45A, Ala. R.App.P.
Accordingly, we affirm Smith’s sentence of death.
AFFIRMED.
McMILLAN and WISE, JJ„ concur.
SHAW and WELCH, JJ., concur in the result.
BASCHAB, P.J., dissents, with opinion.

. This brief was filed with this Court on December 20, 2005.

. The last individual struck by the State served as an alternate. See Rule 18.4(g)(3), Ala.R.Crim.P.

. To protect the anonymity of the jurors, we are using their initials.

. Smith argues in his brief to this Court that the prosecutor erroneously stated as a basis for removing P.W, that she wavered about the level of proof necessary for her to impose the death penalty. However, P.W. was not asked about the burden of proof. “ ' “A prosecutor may strike for mistake, as long as tire assumptions involved are based on an honest belief and are racially neutral." ’ Reese v. City of Dothan, 642 So.2d 511 (Ala.Crim.App.1993).” McElemore v. State, 798 So.2d 693, 698 (Ala.Crim.App.2000). The reason was race-neutral. Also, the prosecutor gave two other race neutral reasons for removing this prospective juror.

. The State also introduced evidence of a videotape that showed Smith being booked on the capital-murder charges. This videotape was admitted to rebut evidence indicating that Smith was mentally retarded and was admissible in the penalty phase. See § 13A-5-45(d), Ala.Code 1975. See also Siegel v. City of Decatur, 669 So.2d 1029 (Ala.Crim.App.1995) (videotape of police booking was admissible in driving-under-the-influence case because it was relevant to the question whether the defendant was intoxicated). Here, the videotape was relevant to Smith’s claim that he was mentally retarded. The trial judge even noted that he wondered why Smith was objecting to this evidence.

. Smith admitted during the guilt phase that he had previously been convicted of breaking and entering a vehicle. The presentence report also shows this prior conviction.

. The prosecutor stated in his opening statement that Whisenhant had “robbed a blind black lady in Prichard, Alabama, and was able to 'beat ’ that charge” and that he had committed another homicide in Prichard. Whisenhant v. State, 482 So.2d at 1239.

. After the Alabama Supreme Court released Whisenhant, the United States Supreme Court held that a harmless-error analysis applies even to the jury's consideration of an erroneous aggravating circumstance. See Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); see also Brooks v. State, 973 So.2d 380 (Ala.Crim.App.2007).

. In fact, defense counsel argued in both his opening statement, which was made after the State presented its case, and in closing, that a document that Officer Yost had obtained from Smith, when Smith gave police the false name of “Christopher Michael Turner,” showed that Smith spelled the name "C-u-m-r-i-m T-u-m-n-t-h-n” and was evidence indicating that Smith was mentally retarded.

. It appears that some of the confusion in this case was caused by the fact that the same jury did not sit for the guilt phase and the penalty phase. During the guilt phase Smith testified in his own behalf and said that he had four prior convictions—assault in the first degree, robbery in the third degree, unlawful breaking and entering of a motor vehicle, and escape. In the typical situation, the same jury would have heard that evidence before conducting the sentencing hearing.

. In Duke the only aggravating circumstance was that the murders were especially heinous, atrocious, or cruel as compared to other capital murders. Like this case there was no aggravating circumstance that was also an element of the capital murder.
Duke’s death sentence was ultimately set aside, and he was sentenced to life imprisonment without the possibility of parole because he was under the age of 18 when the murders were committed.

. Smith argues in his reply brief to this Court that the motion was deemed denied by operation of law. He cites a civil case in support of this contention. However, the only motion in a criminal case that is deemed denied by operation of law is a postjudgment motion. See Rule 24.4, Ala.R.Crim.P.

. In the first sentence of this argument in Smith’s brief he again argues that the prosecutor violated Batson; however, we have addressed this issue in Part I of this opinion.

, We have condemned the practice of citing a laundry list of issues in a brief in a death penalty case and have referred to this practice as “sandbagging.” See Flowers v. State, 799 So.2d 966 (Ala.Crim.App.1999).

. Smith tried to have this evidence introduced even though he freely admitted “I don't know what is all in there.” (R. 1117.)